(No. 77419

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANDREW MAXWELL, Appellant.

*Opinion filed June 20, 1996.—Rehearing denied September 30, 1996.*

104

McMORROW, J., dissenting.

David T. Rothal, of Chicago, and David J. Keefe, of Waukegan, for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

The defendant, Andrew Maxwell, appeals (134 Ill. 2d R. 651(a)) the judgment of the circuit court of Cook County dismissing without an evidentiary hearing his amended petition for post-conviction relief, brought pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122—1 et seq. (West 1992)). Following a jury trial the defendant was convicted of murder and attempted armed robbery committed on October 26, 1986. He waived his right to a jury for purposes of his capital sentencing hearing, and the trial court imposed a sentence of death on the conviction for murder and a term of 15 years on the conviction for attempted armed robbery. In his direct appeal (People v. Maxwell, 148 Ill. 2d 116 (1992)), this court affirmed his convictions and sentences. Thereafter the United States Supreme Court denied his petition for a writ of certiorari (Maxwell v. Illinois, 506 U.S. 977, 121 L. Ed. 2d 377, 113 S. Ct. 471 (1992)). Challenging the dismissal of his amended petition without an evidentiary hearing, defendant presents 22 issues for our review. For the reasons that follow, we affirm. Because the facts of this case are set forth adequately in the opinion concerning defendant's direct appeal, we state here only those facts necessary to the disposition of his post-conviction appeal.

A proceeding brought pursuant to the Post-Conviction Hearing Act is not an appeal per se but,

rather, a collateral attack on a judgment. *People v. Caballero*, 126 Ill. 2d 248, 258 (1989). The purpose of the proceeding is to allow inquiry into constitutional issues related to the original conviction that have not or could not have been adjudicated. *People v. Whitehead*, 169 Ill. 2d 355, 370 (1996). It is the defendant's burden to show a substantial deprivation of his constitutional rights (*Whitehead*, 169 Ill. 2d at 370), and determinations made by the circuit court will not be disturbed unless they are manifestly erroneous (*People v. Silagy*, 116 Ill. 2d 357, 365 (1987)). The defendant is not entitled to an evidentiary hearing unless the allegations of his petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that his rights have been so violated. *Caballero*, 126 Ill. 2d at 259. In determining whether an evidentiary hearing should be granted, all well-pleaded facts in the petition and in any accompanying affidavits are to be taken as true. *Caballero*, 126 Ill. 2d at 259.

Initially defendant contends that he was denied his constitutional right to the effective assistance of counsel at the second phase of the sentencing proceeding because counsel failed "to investigate and present available evidence in mitigation." Specifically, defendant asserts that trial counsel conducted virtually no investigation into his background, failing (1) to investigate his developmental history; (2) to discover and present to the court not only his school records, which would have revealed his intellectual and developmental deficits, but also his medical records as well as records of childhood psychological tests; (3) to obtain a professional drug and alcohol evaluation with which to gauge the extent of his problem with substance abuse; (4) to discover the alcoholism and attendant denial that pervaded his family, which would have been revealed and explained had counsel obtained a comprehensive social history; (5) to

obtain any kind of current psychological or psychiatric evaluation; and (6) to interview the defendant himself sufficiently. The defendant's voluminous amended post-conviction petition, which includes numerous supporting reports and affidavits attached as exhibits, sets forth these claims in detail.

In his amended petition defendant alleges that because trial counsel failed to obtain his school records, counsel did not know of the determination by his school that he was, in defendant's words, "educably mentally handicapped" and that, as a result, counsel could not make an informed decision as to how this information would affect sentencing. In the same way, defendant alleges, counsel did not know of defendant's "borderline mentally retarded I.Q." Similarly, counsel's failure to obtain a drug and alcohol evaluation of defendant meant that his attorneys were not fully aware of the extent of his problems. Counsel's failure to interview defendant's father and his sisters, Monalisa Maxwell and Martha Brown, and to investigate or evaluate drug and alcohol usage in his immediate family prevented counsel from understanding defendant's drug dependency, his intellectual and developmental deficiencies, and his family's denial of those problems; as a consequence, defendant alleges, counsel lacked a strategy for mitigation. Defendant alleges finally with respect to this first claim of his amended petition:

> "Assuming arguendo that trial counsel was not inadequate for concluding, based on her limited investigation, that [defendant] had not had significant intellectual, physical and developmental deficits, trial counsel was put on notice of these problems by the Presentence Report which had been filed March 11, 1988. [Ex. 17] [sic] Counsel was incompetent for failing to pursue this evidence."

The defendant includes as an exhibit in support of this claim the affidavit of Louis Hemmerich, Ph.D., a clinical psychologist who tested him on March 14, 1993.

The affidavit includes the report of his psychological evaluation. In it the defendant is reported to have stated that he had been held back in the third grade because of a lack of academic progress and that he had been in special education classes during most of his formal education. The defendant also reported having had psychiatric counseling, in Dr. Hemmerich's words, "for a brief period of time, about six months, when he was in the third or fourth grade." He described the defendant's Full Scale score on the Wechsler Adult Intelligence Scale-Revised as being within the borderline mentally retarded range of intellectual ability. The pattern of scores obtained on this administration of the intelligence test suggests, Dr. Hemmerich concluded, that defendant suffers from a verbal information processing learning disability. In his summary he assessed the test results as indicating that defendant was functioning "within the borderline mentally retarded range to the low average range of intellectual ability."

Dr. Hemmerich stated further that defendant

"reported a serious history of alcohol and drug abuse. He stated that he began smoking marijuana at the age of twelve. At that time, his sisters would encourage him to smoke a joint with them since they enjoyed watching him 'get silly.' He reportedly began drinking alcohol at approximately the age of 14. At the age of 16, he began using cocaine. During this period of time, he also took codeine, up to three ounces of syrup and three pills at a time. By the age of 17, he admitted to drinking 1/2 pint of whiskey and smoking a nickel bag of marijuana each night. Later that year, he stated that he would smoke marijuana laced with cocaine. He stated that he had a hard time functioning without using drugs and alcohol, and reportedly used substances on a daily basis."

Dr. Hemmerich concluded that the amount of drugs and alcohol reportedly consumed, as well as the withdrawal symptoms defendant reported, suggest that he was physiologically addicted to drugs and alcohol. The psychologist reported further that defendant

"stated that he had never participated in any drug or alcohol treatment program. He stated, 'I never admitted I had a problem.' He stated that he has experienced numerous legal difficulties due to drug and alcohol abuse. He has been arrested a number of times over the years for illegal activities which he stated that he engaged in [sic] order to support his drug and alcohol habits."

In ruling upon the State's motion to dismiss the amended petition without an evidentiary hearing, the circuit court, having examined the petition and exhibits, remarked as follows:

"We have had an opportunity on several occasions, I might add, to review all of the material that has been submitted to us. Obviously, we are very familiar with the case, having heard the case, the case at the trial level, and having presided over all of the proceedings therein, not only on the trial but also the preliminary motions, and also obviously the sentencing proceedings. We have reviewed the post-conviction petition. ***

*** We *** feel, and we have reviewed this thoroughly, that the provisions, the two-pronged test in Strickland; i.e., whether counsel's performance at the sentencing proceeding fell below what is commonly accepted standard and maybe more importantly at least in the Court's mind, but for that error, whether the results would be different, and we most respectfully come down on the side of the State because we feel it would not have, and the motion to dismiss the post-conviction petition will be granted."

Available to the trial judge prior to sentencing was the presentence investigation report, to which defendant refers in his amended petition. About the physical and mental health of the defendant, who was born in November of 1966, the report says,

"The defendant states that when he was in third grade his teacher recommended he see a psychiatrist. He states he saw some doctor for his third and fourth grade years once a week. He states he has no idea why he was seeing this doctor and doesn't remember what the doctors [sic] name was.

The defendant states that since fifth grade he was placed in slow learner classes and does not have any idea why he was placed in that type of program."

Of defendant's history of alcohol and drug use, the report indicates,

"The defendant states he began drinking at age seventeen and stated since that time he has been drinking beer and/or vodka every day, depending on the day he may drink anywhere from three beers to a twelve pack and/or one half pint vodka.

The defendant states he began using marijuana at age seventeen. He also states he uses marijuana and cocaine everyday and has so since around age seventeen.

He states he smokes two nickel bags of marijuana everyday and states he uses $20.00 to $25.00 a day of cocaine. He states he supported his habits by Public Assistance, odd jobs, paper routes, and his mother. The defendant states he knew he had a drug problem since age seventeen but has never tried to get help for this problem."

It is well established that the standard for determining whether a defendant has received effective assistance of counsel at trial or at a death penalty hearing consists of two elements, deficiency and prejudice. *People v. Brisbon*, 164 Ill. 2d 236, 245-46 (1995); *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) (adopted by this court in *People v. Albanese*, 104 Ill. 2d 504 (1984)). Under this two-part test, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, were it not for counsel's professional errors, the result of the proceeding would have been different. *Whitehead*, 169 Ill. 2d at 390. A reasonable probability is one sufficient to undermine confidence in the outcome of the proceeding. *Whitehead*, 169 Ill. 2d at 390. To establish ineffective assistance of counsel at a death sentencing hearing, the defendant must prove that counsel's representation was deficient and that, but for counsel's deficient conduct, the sen-

tencer would have concluded that the balance of aggravating and mitigating factors did not warrant death. *Brisbon*, 164 Ill. 2d at 246.

We need not determine whether counsel's performance fell below an objective standard of reasonableness because defendant fails to show that counsel's alleged omissions prejudiced him. The gulf is relatively slight between what the trial judge knew from his reading of the presentence investigation report at the time of sentencing with respect to defendant's intellectual and developmental deficits and his drug and alcohol abuse and what defendant alleges in this regard in his amended post-conviction petition. As a result, there is no reasonable probability that, had counsel provided this information to the court and focused upon it at the sentencing hearing, the court would have concluded that the balance of aggravating and mitigating factors, which are summarized in the opinion in defendant's direct appeal, did not warrant the imposition of the death penalty. Indeed, the circuit court, which noted that it had reviewed all of the material submitted with respect to defendant's amended post-conviction petition and that it had presided over all of the proceedings related to defendant's trial and sentencing hearing, ruled in favor of the State because of the court's express feeling that the outcome would have been no different. Our reading of the record leads us to the same conclusion. This entirely reasonable determination by the circuit court can hardly be said to be manifestly erroneous, and we will not disturb it.

Defendant contends next that he was denied the effective assistance of counsel at sentencing because trial counsel advised him "that the court would not impose death, and [defendant] relied upon that advice when he waived jury." He claims that he was induced to waive jury for sentencing through trial counsel's assurance

that the judge had signaled that he would not sentence defendant to death. In an affidavit attached as an exhibit to his amended petition, defendant states, "[B]efore the time that I waived my right to a jury at sentencing, my trial counsel, Clare Hillyard, advised me that the trial judge *** had stated to her that [he] would not impose the death penalty if I waived a jury at sentencing." Defendant states further, "[I]n reliance upon counsel's advice that Judge Karnezis would not impose the death penalty, I agreed to waive a jury at sentencing, despite my initial reluctance to waive my right to a jury." In an affidavit attached as an exhibit to defendant's amended petition, Clare Hillyard, who was one of defendant's trial attorneys, states as follows:

"That [defendant] agreed to waive a jury for any possible sentencing proceedings prior to the jury selection in the guilt-innocence phase of his trial; that he was fully informed of the advantages and disadvantages of his options; that careful consideration was given to this decision over a long period of time.

*** That during a strategy discussion after the jury verdict, the Judge made a comment in the presence of the State's Attorneys, defense counsel and the defendant about the death penalty, 'if it comes to that'; [t]hat a facial expression and voice inflection inspired the belief that the death penalty would not be imposed; that none of the prepared mitigation was curtailed as a result of said comment."

Also attached to the amended petition as an exhibit is the affidavit of Charles Hoffman, who represented defendant in his direct appeal; he states that at a meeting following defendant's conviction and sentencing, Clare Hillyard and defendant's other attorney at trial, Michael Brennock, told him that

"prior to sentencing, they had firmly believed that Judge Karnezis would not impose death on [the defendant]. They said they got what they interpreted as a 'signal' from Judge Karnezis that if they took a bench sentencing, he

would not impose a sentence of death. Brennock said that in his discussions with [defendant] on whether to take a bench or jury sentencing, Brennock told [defendant] that he was '99% sure' that Judge Karnezis would not impose death. Hillyard and Brennock told me they were 'stunned' when Judge Karnezis imposed death on [defendant]."

Another affidavit attached to defendant's amended petition as an exhibit is that of David Rothal, who is one of the attorneys representing defendant in this appeal. He indicates that during a three-way telephone conference with Clare Hillyard and the other attorney representing defendant in this appeal, "Ms. Hillyard stated that based upon Judge Karnezis' statement 'if it comes to that', her determination that [defendant's] case was not a particularly aggravating one, and other factors, she recommended to [defendant] that he waive a jury for sentencing."

In defendant's direct appeal he contended that his waiver of a jury for purposes of the sentencing hearing was invalid because it was based on the erroneous advice of his attorney, given to him because of counsel's mistaken belief that evidence of defendant's involvement in offenses of which he had not yet been convicted could not be introduced at the sentencing hearing. *Maxwell*, 148 Ill. 2d at 140, 143. Defendant maintained that counsel was ineffective and his jury waiver, therefore, invalid. *Maxwell*, 148 Ill. 2d at 142. Counsel's error notwithstanding, this court concluded, on the record before it, that counsel had not rendered ineffective assistance in advising defendant to waive a jury and that the defendant's jury waiver was not invalid on this ground:

"As an examination of defense counsel's remarks makes clear, counsel offered three distinct reasons in support of her decision to advise the defendant to waive a jury for the sentencing hearing. First, counsel apparently believed that the judge was more likely to be lenient than a jury; counsel stated that she and her client preferred

that the judge make the sentencing determination. Second, counsel wanted to preclude death-qualification of the jury for purposes of the guilt phase of the proceedings. (See *Daley v. Hett* (1986), 113 Ill. 2d 75.) Third, counsel did not want the sentencing decision to be made by a jury if its members had been exposed to, or, in counsel's words, had been 'inflamed' by, evidence of the defendant's other offenses. For these reasons, then, counsel recommended that the defendant waive a jury for the death penalty hearing.

'A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.' (*Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) Any one of the three grounds mentioned by counsel constitutes a valid reason for choosing to waive a sentencing jury." *Maxwell*, 148 Ill. 2d at 143-44.

Under the circumstances, this court said, counsel's mistaken belief concerning the admissibility of evidence of other crimes did not result in an act or omission reflecting unreasonable professional judgment; counsel's recommendation that the defendant waive a jury for the sentencing phase was entirely consistent with counsel's strategy to avoid submitting the sentencing determination to jurors who were aware of the defendant's criminal record. *Maxwell*, 148 Ill. 2d at 144.

In defendant's direct appeal the court's conclusion that defendant had failed to show that counsel had acted in a professionally unreasonable manner was dispositive of the defendant's claim for failure to establish one of the two necessary parts of the *Strickland* test. However, this court went on to consider whether, assuming that counsel's mistaken belief resulted in a professionally unreasonable act or omission, defendant sustained prejudice as a consequence. The court determined that he had not, concluding that defense counsel would have offered the same recommendation had she known that the evidence of the defendant's other crimes would later

be admissible at the sentencing hearing. *Maxwell*, 148 Ill. 2d at 145. The court pointed out,

"As we have stated, one reason for counsel's recommendation to the defendant that he forgo a jury for sentencing was to avoid submitting the sentencing determination to jurors who were aware of the defendant's extensive criminal record. Recognition that the jurors would eventually acquire this information at the sentencing hearing could only have confirmed counsel in her assessment that a jury waiver was necessary to effectuate her strategy. Here, counsel achieved her avowed goal of not having the sentencing determination submitted to a jury if its members were aware of the defendant's criminal history." *Maxwell*, 148 Ill. 2d at 145-46.

In effect, defendant attacks in his post-conviction petition one of the three grounds stated by counsel as a reason for choosing to waive a jury for sentencing, namely, counsel's belief that the judge was more likely to be lenient than a jury. However, two valid reasons remain for defendant's having chosen to waive a jury at sentencing: the wish to preclude death-qualification of the jury for purposes of the guilt phase of the proceedings and the desire to avoid sentencing by jurors who had been exposed to evidence of defendant's other offenses. Thus defendant could have suffered no prejudice as a result of counsel's advice to waive a jury for sentencing. Inasmuch as defendant cannot meet the requirement of *Strickland* that he show prejudice, namely, that he would not have waived his right to a jury in the absence of the error alleged (see *Maxwell*, 148 Ill. 2d at 142), the circuit court properly dismissed this claim of his amended post-conviction petition without an evidentiary hearing.

In the third issue defendant presents for our review, he contends that he was denied his constitutional rights as a consequence of the proceedings in which he waived a jury for sentencing. More specifically, he maintains that he was denied due process because the trial court

did not ask him whether any promises were employed to induce his waiver, which was obtained, he avers, as the result of a misrepresentation by counsel that such a promise had been made. Despite the different origins of a defendant's right to a jury at the guilt phase of the proceedings and his right to a jury at the capital sentencing hearing, the waiver of either right to a jury must be knowing, intelligent, and voluntary. *People v. Strickland*, 154 Ill. 2d 489, 517 (1992). As defendant points out, this court held in *People v. Albanese*, 104 Ill. 2d 504, 535 (1984), the sixth amendment requires no precise formula for determining whether a waiver has been knowingly and intelligently made. The court need not deliver a formulaic recitation prior to receiving a defendant's valid waiver of a jury at a capital sentencing hearing. *Strickland*, 154 Ill. 2d at 517. Instead, each case turns on its own facts and circumstances. *Albanese*, 104 Ill. 2d at 535-36.

With respect to the defendant's waiver of a jury for sentencing, the record includes the following colloquy between the trial court and the defendant:

"THE COURT: Okay, Mr. Maxwell, your attorney is indicating at this time that in the event, in the event that the jury were to find you guilty of the charge of murder, and in the further event that the State indicated that they would be seeking the death penalty, it would be your intention to waive your right to have that jury determine that question. Do you understand what I am saying?

DEFENDANT MAXWELL: Yes, sir.

THE COURT: Okay. Now, you have a right to have a—jury decide the question of whether or not the death penalty is to be imposed. Do you understand?

DEFENDANT MAXWELL: (Nodding head.)

THE COURT: Now, that, of course, would only arise if in the event you were found guilty of the offense of murder. Do you understand that?

DEFENDANT MAXWELL: Yes.

THE COURT: Now, that right cannot be taken away

from you. You must knowingly waive or give up that right to have the jury make that determination. Do you understand that?

DEFENDANT MAXWELL: Yes, sir.

THE COURT: If you waive that right, the right to have a jury make that determination, I will hear the—it would be up for—it would be for me to determine whether the death penalty would be imposed or not in the event that you were found guilty. Do you understand that?

DEFENDANT MAXWELL: Yes, sir.

\*\*\*

THE COURT: \*\*\*

What I am saying, instead of having 12 jurors reach a unanimous verdict of 12 to nothing, it would be for me alone to make that decision. Do you understand that?

DEFENDANT MAXWELL: Yes, sir.

THE COURT: Now, do you wish a jury to make that determination, or do you wish to have a judge, myself, decide that—make that decision in the event that you are found guilty?

DEFENDANT MAXWELL: You, sir.

THE COURT: You wish to have me make that decision?

DEFENDANT MAXWELL: Yes, sir.

\* \* \*

THE COURT: \*\*\*

When we say, Mr. Maxwell, that the 12 people must decide, there could be a situation where 11 people say the death penalty should be imposed and one says it should not, and the death penalty would not be imposed. You understand that, that that decision by the 12 jurors must be a unanimous decision, and in the event that it is not a unanimous decision, then the death penalty could not be imposed. Do you understand that?

DEFENDANT MAXWELL: (Nodding head.)

THE COURT: And knowing and understanding all of these things which I have just stated, you are choosing to waive your right to a jury for the penalty phase, is that correct?

DEFENDANT MAXWELL: Yes, sir.

THE COURT: \*\*\* I will ask you to indicate that by

signing the waiver which your attorney has prepared. I just want to make sure that we are covering all of the points.

Now, Mr. Maxwell, you are making this waiver. You have executed this waiver freely and voluntarily?

DEFENDANT MAXWELL: Yes, sir.

THE COURT: Nobody has threatened you in any way?

DEFENDANT MAXWELL: No, sir.

THE COURT: Nobody is forcing you to sign this waiver, is that correct?

DEFENDANT MAXWELL: Yes, sir.

THE COURT: And I assume you have discussed this matter with your attorneys prior to today, have you not?

DEFENDANT MAXWELL: Yes, sir.

THE COURT: Okay, and after discussing it with them, you are choosing at this time to waive your right to have a jury make the determination as to whether the death penalty should be imposed in the event there is a finding of guilty?

DEFENDANT MAXWELL: Yes, sir.

THE COURT: That is your wish?

DEFENDANT MAXWELL: Yes, sir.

THE COURT: Okay, I believe I have covered, I hope, all of the possible—just give me one more second.

Okay, we will in our discretion accept that jury waiver, and that will be made a part of the file."

As the State indicates, the inquiry by the trial court was extensive and thorough, exploring fully defendant's understanding of that which he was relinquishing. We agree with the State that while this colloquy does not include an inquiry as to whether any promises were made, it establishes sufficiently the knowing, intelligent, and voluntary nature of defendant's waiver of a jury for sentencing. We conclude that defendant was not denied due process in this regard and that his waiver was effective. Hence, the circuit court appropriately dismissed the third claim of defendant's amended post-conviction petition.

In another issue defendant raises for review, he

contends that his constitutional rights were violated "at
the pre-trial motions stage of the trial, because studies
and reports, establishing that physical abuse of prison-
ers and coercion of confessions at Area 2 Violent Crimes
was widespread and systematic—evidence which would
have been instrumental in persuading the court to grant
defendant's motion to suppress evidence—were not
available to the defense at the time of trial." Defendant
argues that the physical abuse and denial of rights that
were employed to obtain his confession were found to be
a regular practice at Area 2 Violent Crimes, where he
gave statements confessing his involvement in the of-
fenses in question. In his amended post-conviction peti-
tion, he alleges that had this evidence been available to
counsel at the time of his trial, it could have served as
the basis for admitting specific evidence from other
victims of abuse to rebut the mere denials of police that
they beat defendant and refused to allow him to call his
lawyer. He alleges further that had the trial court "been
informed of the extent of abuses occurring at Area 2, of
the sanctioning of these abuses—and participation in
them—by command, and the evidence that officers who
conducted [defendant's] interrogation were specifically
named among the perpetrators [Ex. 19, 22, 25, 26, 27,
53, 56], it is reasonable to conclude that defendant's mo-
tion to suppress confession would have been granted."
As a consequence, he alleges, the outcome of his trial
would have been different. By "command," defendant
refers to Commander John Burge. Numerous exhibits,
including affidavits, reports, and transcripts, are at-
tached to his amended petition in support of this claim.

In ruling on the motion of the defendant as well as
those of his two codefendants to suppress statements,
the trial court expressly found "that they were not
struck or threatened in any way by Detective Paladino,
Detective Glynn, Detective Basile, and Assistant State's

Attorney Telander." In so ruling, the trial court found further "no evidence of physical abuse" and that "[a]ny alleged injury to any of these individuals did not occur as a result, Court finds did not occur as a result of any police action prior to these statements being made." In support of his motion to suppress the oral and signed statements that he had given on November 12, 1986, defendant had introduced into evidence photographs taken a week later, on November 19, 1986. The defendant testified at the hearing on his motion to suppress statements that the pictures showed a knot on the left side of his head, swelling above his eyebrow, and a knot on his right leg.

When it is evident that a defendant has been injured while in police custody, the State must show by clear and convincing evidence that the injuries were not inflicted as a means of producing the confession. *People v. Wilson*, 116 Ill. 2d 29, 40 (1987). To do so requires more by the State's witnesses than mere denial that the confession was coerced. *Wilson*, 116 Ill. 2d at 40. Here, however, it was not evident that the defendant had been injured while in police custody. In view of the trial court's findings that there was no evidence of physical abuse of the defendant and that any alleged injury did not occur as a result of any police action prior to giving the statements sought to be suppressed, the defendant, by these tangential allegations, has failed to make a substantial showing that his constitutional rights were violated. Thus, the determination of the trial court dismissing his amended post-conviction petition without an evidentiary hearing was not manifestly erroneous, and we do not disturb it.

In another, related issue defendant asserts that he was denied his right to due process when the State failed to disclose to the defense that the deprivations of rights complained of in his motion to suppress statements were

widespread and systematic at Area 2 Violent Crimes Headquarters. In his amended post-conviction petition, he alleges that prior to trial he filed a motion for discovery requesting that the State produce "any and all material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor." In its answer to discovery the State responded, "None known to the People." In his brief defendant states that the superintendent of police failed to notify the State's Attorney and the judiciary that an internal investigation revealed that Area 2 had become the scene of widespread abuses. While defendant considers it "doubtful that the specific prosecutors whose answer to discovery misled the defense in this case were actually aware that reports existed which would gravely undermine the credibility of the police," he maintains that prosecutors had a duty under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), to tender this information to defense counsel pursuant to defendant's motion for discovery. He argues that evidence of the abuses and beating that were practiced at Area 2 Violent Crimes and by the detectives who interrogated defendant would have tended to negate his guilt because such evidence would have increased the likelihood that his coerced statement would have been suppressed. Even assuming that suppression of the defendant's inculpatory statements to police would have led to his acquittal, in light of the findings of the trial court following the hearing on his motion to suppress these statements, particularly the court's finding of "no physical abuse" of the defendant, he has failed to make the requisite substantial showing that his constitutional rights have been violated.

Ten of the issues defendant asks us to consider were raised in his direct appeal. He merely repeats them here

without argument, stating that he stands on the arguments set forth in his brief in the direct appeal, which is included in the record as an exhibit attached to the amended post-conviction petition. The scope of post-conviction review is limited by the doctrines of both *res judicata* and waiver, with the result that post-conviction proceedings are limited to issues that have not and could not have been previously adjudicated. *People v. Stewart*, 123 Ill. 2d 368 (1988). All issues actually decided on direct appeal are *res judicata*, and all those that could have been presented but were not are deemed waived. *Stewart*, 123 Ill. 2d at 372. These ten issues raised in his direct appeal are *res judicata*, and we do not address them further.

We have read the entire record for review and have examined it with regard to the remaining issues defendant presents. We conclude that they are without merit.

Therefore, for the reasons stated above, we affirm the judgment of the circuit court of Cook County dismissing the defendant's amended petition for post-conviction relief. We hereby direct the clerk of this court to enter an order setting Wednesday, November 13, 1996, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. The defendant shall be executed in a manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE McMORROW, dissenting:

The issue in this appeal is whether defendant has established entitlement to an evidentiary hearing on the allegations in his amended post-conviction petition. The trial court summarily dismissed defendant's peti-

tion, and denied defendant an evidentiary hearing on the allegations in his amended post-conviction petition. For the reasons that follow, I believe that the well-pleaded allegations of the post-conviction petition and its accompanying exhibits satisfy the threshold requirement that defendant demonstrate a substantial deprivation of his constitutional rights. I conclude that the majority errs in affirming summary dismissal of defendant's petition and therefore dissent.

I believe that defendant has established his right to an evidentiary hearing on his amended petition for post-conviction relief for two reasons. First, there are significant allegations that, in violation of his constitutional rights, defendant did not receive effective assistance of counsel throughout the various stages of this capital prosecution. Second, there exists compelling information, not available to trial counsel at the time of the motion to suppress defendant's confession, that certain detectives at Area 2 Violent Crimes, including three of the officers who interrogated defendant, participated in systematic abuse to coerce confessions from prisoners.

Defendant's amended post-conviction petition, which is accompanied by numerous factually detailed affidavits, reports, court filings, and other documents, reveals that defendant was 19 years old at the time of the commission of the crimes charged, is borderline mentally retarded, and has a long history of physical disabilities, serious mental deficits, and developmental problems, along with a history of familial substance abuse and denial. Defendant has expressed remorse for the crimes. According to a psychologist who examined defendant after he was found guilty, defendant exhibits rehabilitation potential and is a good candidate for successful adjustment to the structured environment of prison. Defendant's trial attorneys did not investigate or present evidence of these and other significant matters

at the sentencing hearing. It is uncontroverted that both of the defense attorneys advised and persuaded defendant to waive his right to have the jury decide the capital sentencing issue because the attorneys believed the judge had signalled to them that he would not impose the death penalty if defendant waived his right to have a jury determine his sentence. Subsequently, defendant was sentenced to death for the crime of murder in the course of attempted armed robbery.

The victim in this case, Adrian Bracy, was walking with a friend when defendant and two companions, Gregory Howard and Jerry Thompson, attempted an armed robbery. According to trial testimony, defendant pointed a gun at Bracy and announced a "stickup." Bracy threw a bottle of beer toward defendant, who then fired the fatal shots. Defendant, Howard, and Thompson were subsequently interrogated as suspects in the homicide. All three made incriminating statements to police detectives. Howard and Thompson entered negotiated pleas of guilty and received 35 years in prison. Defendant was convicted of murder in the course of attempted armed robbery and sentenced to death. This court affirmed on direct appeal. *People v. Maxwell*, 148 Ill. 2d 116 (1992).

The instant post-conviction petition claims that trial counsel failed to adequately represent defendant at several key stages of the criminal proceedings. The alleged errors include the following: (1) defendant's trial lawyers induced defendant to waive his right to have a jury determine his sentence by advising defendant that they had received a sign from the judge that he would not impose the death penalty if defendant waived the jury; (2) partly in reliance on their belief that the court would not sentence defendant to death, the defense attorneys failed to investigate or present significant evidence in mitigation at the capital sentencing hearing, despite the

availability of such evidence; and (3) the attorneys failed to offer a consistent or coherent theory of defense, choosing instead to virtually concede defendant's participation in the crimes in order to argue, erroneously, that because defendant lacked the intent to kill and did not take money from the victim, defendant therefore was not liable for felony murder.

In addition to the above assertions, defendant claims that the outcome of the hearing to suppress his statement and the trial itself would have differed if defendant had been able to obtain police reports and files containing the numerous charges of physical abuse of suspects by officers at Area 2 Violent Crimes, including then Commander John Burge and at least three of the individual detectives who interrogated defendant in the case at bar. Had such reports been disclosed to defense counsel, defendant asserts, additional evidence could have been developed that would have strongly corroborated defendant's claim that his statement was the product of coercion by these officers.

## BACKGROUND

On November 4, 1986, defendant was arrested as a suspect in a series of three armed robberies that occurred the day before. Two other men, Thompson and Howard, also were arrested for their participation in those robberies. Witnesses identified the codefendants in lineups. An assistant public defender was appointed to represent defendant on these charges. Approximately one week later, while the three codefendants were in Cook County jail on the armed robbery charges, homicide detectives transferred the three men to Area 2 headquarters for questioning in connection with the October 23, 1986, attempted armed robbery and fatal shooting of Adrian Bracy. After approximately 10 hours of interrogation, during which none of the three men made any telephone calls or consulted with their at-

torneys, all three gave incriminating statements to the police.

According to defendant's testimony at the pretrial hearing on all three defendants' motions to suppress their statements, defendant was not permitted to call a lawyer or his family, despite his request on two occasions to make such calls. Defendant also testified that he was kicked, punched, threatened, and slapped while handcuffed to a wall during interrogation. The other two suspects, Howard and Thompson, gave testimony regarding similar physical abuse and the denial of their requests to telephone family members or attorneys. At the suppression hearing, defendant identified photographs depicting injuries that he alleged resulted from the abuse he received during his interrogation. These photographs were taken by a defense attorney a week after the police interrogation. Photographs of Thompson's injuries were also introduced at the suppression hearing.

In sharp contrast to the codefendants' testimony, the detectives who interrogated the codefendants denied that they were physically mistreated and further testified that the codefendants had not even asked to use the telephone or consult with attorneys.

The trial court ruled that the codefendants had not proved that their statements were the product of police coercion and accordingly denied the motion to suppress their statements. The voluntariness of defendant's statement was not further challenged by defense counsel at trial, argued to the jury, or challenged on appeal. Accordingly, this court on direct review did not consider any issue relating to defendant's alleged beating or coercion as a ground for suppression of his statement. The sole issue on direct appeal regarding the suppression of defendant's statement centered upon defendant's claim that his admission of involvement in the Bracy homi-

cide had been taken in violation of the *Miranda* protections because at the time the Area 2 detectives interrogated him concerning the Bracy homicide defendant was represented by court-appointed counsel on the separate armed robbery charges and counsel was unaware that his client was being questioned with respect to the homicide. See *Maxwell*, 148 Ill. 2d at 126-29.

Before trial on the attempted armed robbery and murder charges, the judge denied the defense motion to bar the State from presenting evidence of defendant's involvement in the three other, pending armed robberies charges. In light of this adverse ruling, one of defendant's attorneys informed the court that defendant would be waiving the jury for sentencing. One of the reasons counsel cited for the jury waiver was her belief that the evidence of other crimes would not be admissible at the aggravation phase of sentencing. Defense counsel apparently believed that the jury at sentencing nonetheless would be influenced by the trial testimony regarding defendant's other pending criminal charges, and therefore be unable to render a fair sentencing decision. In addition, both of defendant's attorneys believed that the trial court had given them a signal that the court would not impose the death penalty if defendant waived the jury for sentencing. The attorneys accordingly advised defendant of their "certainty" that the trial judge would not impose the death penalty, and persuaded defendant to waive his right to a sentencing jury.

At the close of the trial evidence, the jury was instructed on theories including felony murder, a charge which had not been specifically alleged in the indictments. See *Maxwell*, 148 Ill. 2d at 132-40. Defendant was convicted of the crimes charged. At the first phase of capital sentencing, the judge found that the State had proved the statutory death-eligibility factor of murder

in the course of a forcible felony. After the hearing on the mitigation and aggravation evidence, the trial court imposed the death penalty.

Additional facts are supplied as needed in the context of the issues analysis. The post-conviction materials included in the record on appeal consist of the verified 82-page amended post-conviction petition and four bound volumes of exhibits having a combined total of approximately 700 pages.

## I. Ineffective Assistance of Counsel

Of the several assertions of ineffective assistance of trial counsel, the two I view as particularly serious are the advice to waive the jury for sentencing, based on both defense attorneys' belief that the trial judge had signalled his intention not to impose the death penalty, and the attorneys' failure to adequately investigate and present readily available mitigation evidence at the capital sentencing hearing.

### A. *Jury Waiver for Sentencing*

Defendant's affidavit in support of his post-conviction petition asserts that he waived the jury for sentencing based on the advice of his lawyers that the trial judge would not impose the death penalty. As the majority opinion reveals, other affidavits attached to the amended post-conviction petition corroborate that defendant's trial attorneys, Clare Hillyard and Michael Brennock, did in fact inform defendant that the trial judge was not likely to impose death as a sentence if defendant waived the jury. According to one affidavit, Brennock told defendant he was "99%" certain the judge would not impose the death penalty, and he and Hillyard were "stunned" when the court subsequently did so. Attorney Hillyard stated in an affidavit that she understood from the court's comment, facial expression, and vocal inflection that the judge would not impose the death penalty.

Hillyard denied, however, that her preparation of the mitigation evidence was curtailed because of her strong certainty that the court would not impose the death penalty. The circuit court denied defendant's post-conviction counsel's requests to depose Brennock and Hillyard.

Notwithstanding the undisputed and factually corroborated assertion that defendant waived the jury for sentencing based on his two attorneys' express conviction that the judge would not impose the death penalty, the majority holds that defendant has not met the requirement of *Strickland* that he was actually prejudiced by counsels' perceptions. The majority concludes that because Clare Hillyard, one of defendant's attorneys, offered *additional* reasons for her belief that defendant should waive his right to have a jury determine his sentence, reasons that were consistent with legitimate trial strategy, no harm resulted to defendant. To support its conclusion, the majority discusses at length portions of the direct appeal, in which a different issue regarding Hillyard's advice to waive the sentencing jury was resolved against defendant. In the direct appeal, this court acknowledged that Hillyard's advice to her client to waive the sentencing jury was based on her erroneous view of the law, *i.e.*, that evidence of defendant's other crimes would not be admissible in aggravation at the sentencing phase of trial. Hillyard had expressed concern that the jury would be inflamed against defendant if the jury learned that he was accused of participating in a series of armed robberies near in time to the charges for which defendant was on trial. Accordingly, she advised defendant to waive the jury for sentencing. In holding that defendant sustained no prejudice from his attorney's erroneous view respecting the admission of other-crimes evidence at his sentencing hearing, this court concluded on direct

review that counsel's main objective was to prevent defendant from being sentenced by a jury possessing knowledge of defendant's other crimes. *Maxwell*, 148 Ill. 2d at 144. This court observed that by recommending that defendant waive the jury for sentencing, Hillyard achieved this strategic goal of removing the sentencing decision from the jury.

I note that the jury was apprised of the other-crimes evidence during the guilt-innocence phase of defendant's trial because the trial court denied the defense motion *in limine* to bar reference to defendant's pending armed robbery charges. Therefore, Hillyard's advice to waive the sentencing jury for fear that the jury would be inflamed by the other-crimes evidence was not a persuasive reason for urging defendant to consent to the jury waiver. Nonetheless, in the instant appeal the majority relies to a large extent on the analysis of the direct appeal to support its conclusion that defendant has not established prejudice stemming from his attorneys' misleading advice that the judge was not inclined to impose the death penalty. The majority implies that if the defense attorneys' advice to waive the sentencing jury may be justified on *any* of the various grounds advanced, no prejudicial error exists as a matter of law. This view does not, in my opinion, withstand analysis.

In the instant appeal, unlike the direct appeal, defendant has offered affidavits outside the trial record showing that his defense attorneys informed him that the judge exhibited a physical sign that he would not impose the death penalty. In his affidavit, defendant states that he relied on Clare Hillyard's advice that the trial judge *told her* he would not impose the death penalty. Defendant's reliance on such representation as the primary reason for waiving the sentencing jury is far more compelling than the other reasons offered. Would not a defendant facing capital punishment waive

the jury for sentencing if counsel declared that the trial court manifested its intent not to impose death? To merely conclude, as the majority does here, that trial counsel may have had other facially valid reasons to waive the jury for sentencing is to evade the essential point of defendant's argument; *i.e.*, if trial counsel had not assured defendant that the trial court stated it would not impose the death penalty, defendant would not have waived the jury. Under the circumstances, I cannot conclude that defendant knowingly and intelligently waived the jury for sentencing. Nor can I join the majority's conclusion that defendant was not prejudiced by his counsel's misguided assurances that the judge would not impose death. Therefore, I would permit defendant the opportunity to proceed to an evidentiary hearing on his claim of ineffective assistance of counsel with respect to the jury waiver.

As a related matter, defendant contends that the trial court should have granted his motion for substitution of judges, which was presented as part of the post-conviction proceedings. The court summarily denied the motion and no discussion of its merits appears in the transcript. In the instant appeal defendant argues that the court should have recused itself from ruling on the amended post-conviction petition because the impartiality of the court had been called into question over the issue of the jury waiver and trial attorneys' belief that the court had signalled how it would rule on the issue of the death penalty. Moreover, defendant claims, during the court's admonishments on the issue of his rights with respect to waiver of the jury, the trial court did not inquire whether defendant had received any promises or inducements to waive the jury for sentencing. Accordingly, defendant argues, the post-conviction petition should have been transferred for consideration by a different judge.

The majority opinion does not address or even acknowledge the concerns raised by defendant's motion for substitution of judges, despite the apparent significance of the issue. The affidavits of Clare Hillyard and defendant's appellate counsel indicate that the trial judge conveyed something which led the defense attorneys to believe with 99% certainty that the death penalty was not seriously being considered as a penalty by the trial judge. Had a hearing on the post-conviction petition or a hearing on the motion for substitution of judges been allowed, it is likely that the trial judge might have been a witness on this issue. In view of the serious stakes involved, any alleged "cue" from the judge raises the possible appearance of impropriety. I believe, therefore, that the circuit court should have granted the defense motion for substitution of judges. See, *e.g., People v. Washington*, 38 Ill. 2d 446 (1967).

B. *Defense Counsel's Representation at Sentencing*

Defendant claims that his trial counsel was ineffective in failing to investigate and present significant and readily available evidence in mitigation of the death penalty. According to defendant, defense counsel's cursory and incomplete evaluation of his case for sentencing purposes resulted in part because counsel strongly believed that the trial court was not going to impose the death sentence. Irrespective of the cause of counsel's failings, defendant concludes, the result of the inadequate preparation for capital sentencing was highly prejudicial because it left the court with the mistaken impression, as emphasized by the court's remark, that there was not "a single mitigating factor" to preclude imposition of death. This finding by the court led directly to its holding that it was "dutybound to impose the ultimate penalty."

Initially, I note that the majority opinion does not address defendant's contention that his attorneys' fail-

ure to investigate and present mitigation at the sentencing hearing was based, at least in part, on their erroneous interpretation of the judge's "signal" that he would not impose the death penalty. If true, the defense attorneys' alleged shortcomings at sentencing cannot be ascribed to proper trial strategy. See, *e.g.*, *People v. Orange*, 168 Ill. 2d 138, 168-71 (1995) (trial counsel's decision not to present mitigation testimony, based at least in part on counsel's belief that mitigation testimony would not influence sentencing judge, could not be justified as legitimate strategy). Adequate preparation for the aggravation and mitigation phase of a capital sentencing hearing is a crucial aspect of defense counsel's duties, as prejudice resulting from ineffective assistance at capital sentencing is likely to be fatal.

After examining the record I believe that defendant has made a strong preliminary showing of ineffective assistance of counsel at the sentencing phase of his capital prosecution and should be granted an evidentiary hearing on the merits of his claims. Among the numerous exhibits attached to the post-conviction petition is the affidavit of the clinical psychologist who tested defendant and found him to be within the borderline mentally retarded range of intellectual ability. Other evidence reveals defendant's history of serious psychological, physical, and developmental problems beginning in childhood; the resulting difficulties he faced at school; and an extensive family history of alcohol and drug abuse coupled with the family's extreme denial of such problems. None of this material was presented or considered at defendant's sentencing hearing. In fact, the mitigation witnesses who testified denied or downplayed the existence of defendant's impairments and his family's dysfunctions.

According to defendant, his trial counsel failed to interview him in depth to elicit material evidence in

mitigation. Her first meeting with him was 55 days after his incarceration, and she visited him in jail approximately four times within 15 months. Defendant argues that his counsel failed to seek out certain family members and others having knowledge of his background; failed to obtain school and medical records to help evaluate his mental and physical condition; failed to order a current psychological examination; and failed to obtain a professional evaluation of defendant's substance abuse and its effect on his functioning. Instead, counsel called defendant's mother and a few other family members and friends to testify in mitigation as to his good character, but failed to adequately prepare the witnesses. This lack of adequate preparation led to the witnesses' misguided and inaccurate portrayal of defendant's history and family life, which in turn invited the prosecutor's argument that the evidence of good family background was actually aggravating, rather than mitigating, in nature. Defendant further charges that his counsel failed to investigate and present evidence relating to his rehabilitation potential and capacity for a positive adjustment to the structured environment of prison. He concludes that if the materials in the post-conviction petition had been presented at the sentencing hearing, the outcome likely would have differed and the death penalty would not have been imposed.

The majority opinion describes or quotes portions of the mitigation evidence proffered as part of the post-conviction petition and expressly acknowledges "numerous supporting reports and affidavits" bearing on the mitigation issues. After making this observation, however, the majority inexplicably pronounces, without analysis, that

"[t]he gulf is relatively slight between what the trial judge knew from his reading of the presentence investigation report at the time of sentencing with respect to defen-

dant's intellectual and development deficits and his and his family's drug and alcohol abuse and what defendant alleges in this regard in his amended post-conviction petition. As a result, there is no reasonable probability that, had counsel provided this information to the court and focused upon it at the sentencing hearing, the court would have concluded that the balance of aggravating and mitigating factors *** did not warrant the imposition of the death penalty." 173 Ill. 2d at 112.

I cannot join in such a comparison of the materials presented in the post-conviction petition with the *pro forma* presentence investigation report. The former contains extensive school and medical records, affidavits, and other material from outside sources, while the presentence report consists almost entirely of the self-reported statements of defendant, with little or no corroboration or elaboration by others. For example, under the heading "Physical and Mental Health," the brief entry in the presentence investigation report relates defendant's statement that his third-grade teacher recommended he see a psychiatrist, and that he saw "some doctor" weekly during third and fourth grade, but that defendant "has no idea why he was seeing this doctor and doesn't remember what the doctors[']s name was." The defendant also stated to the presentence interviewer that he was placed in slow learner classes since the fifth grade but, again, had "no idea why."

In contrast to these vague, uncorroborated statements attributed to defendant in the presentence investigation report, the amended post-conviction petition offers significant factually detailed and verified exhibits. These include school-initiated reports and referrals relating to defendant's mental deficits, physical problems, and behavioral disorders detected as early as his initial foray into the public school system, in the first grade. According to a 1972 report from the Chicago school system, Bureau of Mentally Handicapped Children, defendant entered first grade with below-average

skills, suffered from a vision deficit, and was referred to the school psychologist for examination because he talked to himself in class, made funny noises, fell out of his chair, and needed constant help to focus his attention on classroom matters. He also was referred for medical examination and found to have an eye condition called strabismus (inability to aim one or both eyes), which required surgery. Defendant's IQ tested at 86 in this initial examination, indicating a "slow average rate of mental growth" and the school psychologist made certain recommendations, concluding that "[w]arm praise for small efforts will help this child."

Defendant was referred to Michael Reese Hospital and Medical Center for vision, physical, and neurological testing. In a 1973 report from the medical center, an interviewer was unable to complete her evaluation of the child's developmental status because of his inability to concentrate during testing. The report notes that the boy's mother expressed surprise at her son's inattentiveness and claimed his behavior at home was different. The Michael Reese Hospital report noted that the boy "seem[ed] to have a great deal of potential if provided with direction and successful experiences" and recommended that defendant receive learning disabled services from the school system. However, he did not immediately receive such services and had to repeat the third grade. He also spent five years in "social adjustment" classes before finally being placed in classes for the educable mentally handicapped in 1978.

In a January 1980 school examination, defendant's IQ had slipped to 70, indicating "a slow rate of mental growth." The report noted that defendant's vision and hearing problems had not been corrected and further stated that defendant appeared to be "a very worried and insecure boy who [was] readily overwhelmed by tasks and needed much encouragement." Emotionally,

he was viewed as a "highly dependent youngster with very low self-esteem who requires much support and reassurance." Defendant's grades while in school were poor and he dropped out of high school in his second year.

The post-conviction materials also contain a lengthy affidavit from Dr. Louis Hemmerich, the clinical psychologist who examined and tested defendant at the behest of post-conviction counsel. Dr. Hemmerich's affidavit enumerates the large number of records and affidavits he reviewed in addition to his testing of and interviews with defendant, which lasted six hours. He found that defendant's full score IQ was 77, indicating a borderline mentally retarded range of intellectual ability which placed him at the sixth percentile when compared to others of the same age range. Defendant also demonstrated significant impairments in his commonsense judgment and abstract verbal reasoning. Dr. Hemmerich concluded that defendant was dependent upon others, wanting their approval, and had adopted his family's coping style of denial, which stemmed from substantial use and abuse of alcohol and drugs. Dr. Hemmerich also concluded that rehabilitation was "certainly possible" for defendant, who exhibited remorse and guilt. The doctor further concluded that defendant would adjust well to the structured environment of prison.

As the record in the instant case demonstrates, the majority errs in implying that the cursory presentencing investigation report provided the trial court with adequate and credible information respecting defendant's mental and physical health and social development. To characterize as "relatively slight" the gulf between what is contained in the presentence report and what is revealed in the numerous exhibits attached to the post-conviction petition is comparable to equating a blurred snapshot with a full-length documentary film.

I would conclude on the basis of the materials contained in the post-conviction petition and under Illinois law that "defendant did not receive the individualized sentencing determination that the Constitution requires. [Citation.]" *People v. Perez,* 148 Ill. 2d 168, 195-96 (1992). In *Perez,* the circuit court held an evidentiary hearing on a portion of the defendant's allegations but denied post-conviction relief. On appeal, this court reversed the post-conviction judgment and vacated the defendant's death sentence, holding that a new sentencing hearing was constitutionally required because defendant's trial counsel had failed to investigate and provide evidence of mitigation. Such evidence included school records reflecting the defendant's mental deficiency and evidence that the defendant was abandoned by his family as a teenager. As in the case at bar, in *Perez* there existed reports from school psychologists indicating a history of low scholastic aptitude, as measured by low IQ scores, and behavioral problems in the classroom. This court in *Perez* cited with approval "a line of Federal cases in which counsels' failure to investigate and present defendants' mental histories was found to fall below objective standards of reasonableness and constitute ineffective assistance of counsel." *Perez,* 148 Ill. 2d at 190 (citing, *inter alia, Brewer v. Aiken,* 935 F.2d 850 (7th Cir. 1991), *Cunningham v. Zant,* 928 F.2d 1006 (11th Cir. 1991), and *Stephens v. Kemp,* 846 F.2d 642 (11th Cir. 1988)).

In *Aiken,* similar to the case at bar, the defendant and his accomplices had committed a series of armed robberies in one day, and then killed a victim during another armed robbery. The defendant had an extensive criminal history and was sentenced to death upon his conviction of murder in the course of armed robbery. However, the Seventh Circuit Court of Appeals reversed for a new trial based on ineffective assistance of trial

counsel because counsel had failed to obtain and present evidence of defendant's borderline retardation, failure in school, and tendency to be easily led. *Aiken,* 935 F.2d at 859.

In light of the persuasive force of such decisions as *Aiken, Perez,* and the other cases cited above, the decision of the majority in the case at bar is difficult to comprehend. The majority, citing the second prong of *Strickland,* simplistically seizes upon the circuit court's statement that the result of the sentencing hearing would not have differed even if the mitigation evidence had been presented. In so doing, however, the majority fails to consider as true the well-pleaded allegations supporting defendant's constitutional cause of action and thereby fails to apply settled principles of our post-conviction law. See, *e.g., People v. Caballero,* 126 Ill. 2d 248, 259 (1989). The majority offers no decisional authority to justify its rejection of defendant's claim that he was denied effective assistance by his attorneys' failure to investigate and present the mitigation evidence. Indeed, the majority makes no attempt to justify the defense attorneys' failings as proper strategy but instead finds a lack of prejudice resulting from counsel's failings. As previously discussed, the majority's belief that the presentence report adequately apprised the court of the defendant's background is simply unsupportable. Accordingly, the majority's mechanical application of *Strickland* rings hollow. See *People v. Ruiz,* 132 Ill. 2d 1, 25 (1989) ("the sentencing authority in a capital case may not refuse to consider *** relevant mitigating evidence concerning the offender or the circumstances of the offense"). In *Ruiz,* this court held that the defendant's "unchallenged and unheard allegations" of ineffective assistance of counsel, based on failure to investigate and present mitigation evidence, required an evidentiary hearing on the post-conviction petition

because on the record before this court the *Strickland* standard could not be meaningfully applied.

I find it especially disturbing, under the facts of this case, that the majority so readily embraces the circuit court's supposition that the mitigation evidence would not have been sufficient to preclude the death penalty. My review of the record indicates that there is much to militate against imposition of the death penalty. The circumstances surrounding the attempted armed robbery and homicide do not appear unusually egregious or indicative of wanton cruelty. The trial testimony indicates that Bracy was shot after he swung or threw a bottle at defendant. Bracy's companion, who testified against defendant, was not shot. It would not have been unreasonable to infer from these facts that defendant might simply have panicked or felt unreasonably threatened at the sudden movement from Bracy. Although the State implied that the slaying was an "execution," the mere fact that more than one shot was fired does not support the State's characterization in light of the other facts. Moreover, case precedent demonstrates that, although the nature of the crime may be considered in aggravation, even heinous crimes do not obviate the need for an evidentiary hearing when trial counsel fails to investigate and present mitigation evidence at sentencing. See, *e.g., People v. Orange,* 168 Ill. 2d 138, 171 (1995) (rejecting State's argument that the defendant failed to establish prejudice resulting from counsel's ineffective assistance, even where the "heinous nature of the multiple murders for which defendant was convicted is not an inconsiderable aggravating factor"). See also *People v. Thompkins,* 161 Ill. 2d 148 (1994) (remanding for evidentiary hearing on post-conviction claim of ineffective assistance of counsel where, even though counsel had introduced into evidence at sentencing 50 letters in support of defendant, post-conviction

affidavits of family members and friends were of such significance that evidence relating thereto should have been presented at sentencing).

The comparatively shorter prison sentences defendant's two accomplices received further indicate that defendant suffered prejudice from the performance of his counsel at sentencing. Thompson and Howard, the two other participants in the attempted armed robbery and murder of Bracy, pleaded guilty and thus were criminally responsible for the same crimes as defendant. Like defendant, Thompson and Howard were charged with and identified as participants in the three other armed robberies that occurred on November 3, 1986. Thompson and defendant were further identified at defendant's sentencing hearing as being involved in a November 1, 1986, shooting incident in which a mailman was wounded. Notwithstanding this shared history of a recent spree of similar offenses, Thompson and Howard each received only 35 years in prison (the maximum, unextended period of imprisonment for murder was 40 years), as compared with a sentence of death for defendant. Moreover, according to the record, Thompson had a criminal history that included two prior felony convictions, while defendant had one prior criminal conviction, a 1984 robbery (in which Thompson also participated). Finally, although the three armed robberies of November 3, 1986, created a great risk of harm, none of them resulted in killings of any victims. For these reasons, the mitigation evidence presented in the instant post-conviction petition attains critical importance to defendant's right to effective assistance of counsel and due process of law.

To summarize, taking the well-pleaded allegations of the post-conviction petition as true, the specific circumstances of the instant case simply do not justify the majority's ruling that the outcome would not have dif-

fered if the court had considered the evidence in mitigation. Defendant was 19 years old at the time of the commission of the homicide, borderline mentally retarded, and had a documented history of physical disabilities, profound mental deficits, and developmental problems, along with a history of familial substance abuse and denial. Not only did his counsel fail to assemble and present this critical evidence to the court during sentencing, but the mitigation witnesses who did testify characterized defendant's development and family history in terms starkly contradicting the actual circumstances. Defendant's mother denied that defendant was using drugs or alcohol and denied that he had had severe problems or even bad grades in school. Although the several mitigation witnesses testified that defendant had not displayed any violent tendencies and was a helpful and trustworthy person around them, these witnesses also denied that defendant abused drugs or alcohol. As a result of their apparent attempt to paint a more wholesome picture of defendant's background, the witnesses actually contradicted defendant's own statements regarding his substance abuse in the presentence report.

Given the substantial evidence in mitigation that was not presented, solely due to the defense attorneys' failure to investigate, defendant's sentencing hearing was not a true adversarial proceeding of the type required by the sixth amendment. Therefore, I strongly dissent from my colleagues' refusal to grant defendant an evidentiary hearing on defendant's claim of ineffective assistance of counsel. The result of the majority's decision is to permit execution of this defendant despite serious constitutional flaws in defendant's prosecution, particularly the sentencing hearing.

## II. Motion to Suppress Statement Based on Police Coercion

In his amended post-conviction petition, defendant

relies on material outside the trial record to argue that his inculpatory statement to the police following his interrogation was the result of coercive tactics, including physical abuse. The new evidence, which was obtained by post-conviction counsel, includes internal police reports, affidavits, legal filings in other lawsuits, and lengthy additional exhibits corroborating the charge of widespread physical abuse of suspects under interrogation at Area 2 Violent Crimes by certain detectives and supervisors as a means of forcing confessions. Specifically, the record contains the report of an Office of Professional Standards (OPS) investigation into claims of abuse at Area 2 headquarters during the reign of Commander John Burge, who has since been terminated from the Chicago police force as a result of his misconduct.[1] An OPS investigator who studied approximately 50 claims of police abuse during 1978 through 1986 concluded: "[T]he preponderance of the evidence is that abuse did occur and that it was systematic." He further found that "[t]he number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Particular command members were aware of the systematic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end."

Defendant's post-conviction petition contains an affidavit by an attorney claiming considerable experience in police abuse cases. This attorney drew on his own experience of almost 30 years litigating, investigating, or reviewing approximately 75 police brutality claims. He also evaluated the OPS report and other information he

---

[1]The discharge of John Burge and the related disciplinary suspensions of two other Chicago police officers on grounds of improper conduct were upheld by the appellate court in an unpublished opinion. *O'Hara v. Police Board*, Nos. 1—94—0999, 1—94—2462, 1—94—2475 (December 15, 1995).

received. This attorney concluded that three of the four officers who participated in defendant's interrogation at Area 2 had been identified as officers who had engaged in a pattern of brutality during the time defendant and his codefendants were interrogated.

The record also contains pleadings filed in federal court, transcripts of testimony, and orders in which the City of Chicago has settled claims of police brutality. These materials from other cases involve the alleged physical abuse of other defendants by Area 2 officers, including the police officers who procured defendant's inculpatory statements in the instant case.

Despite its acknowledgment of the "[n]umerous exhibits, including affidavits, reports, and transcripts, [which] are attached to [defendant's] amended petition in support of this claim" (173 Ill. 2d at 120), the majority opinion does not further describe or consider the now available evidence suggesting systematic police misconduct at Area 2 at the time of defendant's interrogation. Instead, the majority summarily disposes of defendant's claim of police coercion by deferring to the trial court's original finding, at the hearing to suppress the codefendants' statements, that defendant was not injured and that "any alleged injury did not occur as a result of any police action prior to giving the statements sought to be suppressed." 173 Ill. 2d at 121.

In my view, such a cursory disposition of this serious issue avoids the key inquiry that this court must undertake in considering defendant's claim: Is there a substantial likelihood that the result of the suppression hearing would have differed if defense counsel produced evidence that linked the testifying officers who denied striking defendant to a widespread practice of abuse at Area 2? Certainly such information could have had a dramatic influence on the perceived credibility of all the witnesses who testified at the hearing to suppress the

codefendants' statements. The majority, however, chooses to disregard the impact such evidence might have had on witness credibility by merely assuming that the trial court would have made the same finding—that defendant was not injured by police while in custody—even if there had been a strong showing of systematic prisoner abuse by the officers at Area 2 who interrogated defendant. The majority also ignores the fact that photographs of defendant's and Thompson's injuries were admitted at the suppression hearing.

I do not believe that the majority can fairly dispose of the issue solely by relying on the trial court's original finding at the suppression hearing; *i.e.*, that defendant had not established physical injury caused by police officers. The issue of police coercion in the post-conviction petition is presented in the context of ongoing and systematic abuse at Area 2, an issue which was not present at the suppression hearing. To arrive at the conclusion the majority reaches it is necessary to either ignore the materials included in the post-conviction petition or to conclude that they lack probative value under the specific circumstances of defendant's claim.

It may be true, as the State insists in its brief, that the post-conviction materials regarding the allegedly widespread abusive practices at Area 2 are irrelevant to defendant's claim and thus would be deemed inadmissible at an evidentiary hearing. However, the requirements for determining whether an evidentiary hearing should be held differ from the application of the rules of evidence at such an evidentiary hearing. At this stage of the proceedings I believe it is inappropriate to affirm dismissal of this post-conviction claim by merely conjecturing that some or all of the proffered evidence would be subject to evidentiary challenges at a hearing. Moreover, the majority expresses no opinion as to the probative value of this evidence, choosing instead to

merely repeat the trial court's finding at the suppression hearing that defendant was not coerced, through police abuse, to give his statement relating to the Bracy homicide. By its ruling, the majority assumes that the availability of evidence tending to cast doubt on the veracity of the testifying officers would not have changed the outcome of the suppression hearing.

It is not my purpose in this dissent to imply that a defendant's bare allegation of physical abuse during interrogation is grounds for new trial or post-conviction relief. For practical reasons, if a defendant's assertion of physical abuse by police is uncorroborated by other evidence, such as medical records, photographs, or third-party observation, the defendant's claim of coerced confession may fail. See, *e.g.*, *In re Lamb*, 61 Ill. 2d 383 (1975); *People v. Johnson*, 44 Ill. 2d 463 (1970). Nonetheless, this court has held that the State bears the burden of establishing by the preponderance of the evidence that a defendant's confession was voluntary (*e.g.*, *People v. Wilson*, 116 Ill. 2d 29, 38 (1987)). If the only evidence of coercion is defendant's testimony, and that testimony is contradicted by witnesses for the prosecution, the trial court may choose to believe the State's witnesses. *E.g.*, *People v. La Frana*, 4 Ill. 2d 261, 267 (1954). However, where it is evident or undisputed that defendant received injuries while in police custody and the only question is how and why the injuries were sustained, more than mere denial of coercion by the police is necessary (*La Frana*, 4 Ill. 2d at 267) and the State will be held to the higher standard of establishing, by clear and convincing evidence, that such injuries were not inflicted by police officers to induce defendant's confession (*Wilson*, 116 Ill. 2d at 40).

In *Wilson*, the State's witnesses, including the police officers, the assistant State's Attorney, and the court reporter who took defendant's statement, all testified

under oath that defendant was not threatened or harmed by the police. The trial court denied the motion to suppress. Compelling evidence contradicting the court's conclusion that defendant's confession was not coerced led this court, in the direct appeal, to reverse the conviction and remand the case for a new trial. The evidence of record included testimony that defendant did not have noticeable injuries before the interrogation and the testimony of doctors who examined the defendant directly after his interrogation and discovered significant burns, cuts, and bruises on his face, chest, and legs. See also *People v. Banks*, 192 Ill. App. 3d 986 (1989) (reversing for new trial where fact of defendant's injuries while in police custody was corroborated by evidence including medical testimony, and the police officers' explanation that defendant accidentally fell down the stairs was deemed insufficient to sustain the State's burden of establishing voluntary nature of confession by clear and convincing evidence).

In the instant case there is less evidence of actual injury to defendant than existed in the *Wilson* and *Banks* cases. Nonetheless, it does not appear accurate to conclude, as the majority does here, that there was *no* evidence corroborating defendant's claim of physical abuse and coercion. During the suppression hearing the court was presented with photographs and codefendants' testimony regarding the alleged physical abuse. While the trial court's finding of no injury attributable to police officers may have been supported by the evidence presented and thus within the scope of the trial court's discretion based on the facts before it, the precise issue before this court is not a mere revisiting of the original suppression hearing. *Cf. People v. Hobley*, 159 Ill. 2d 272, 294-95 (1994) (on direct appeal, where no evidence existed to link defendant's chest bruise to abusive tactics of police while interrogating defendant, trial court's

denial of motion to suppress was not an abuse of discretion). We are not reviewing the voluntariness of the confession upon direct appeal. Rather, the question is whether the outcome of the suppression hearing likely would have differed if the same officers who told the court they did not harm defendant had been subject to impeachment based on evidence revealing a pattern of abusive tactics employed by them in the interrogation of other defendants. Unlike my colleagues, I cannot simply conclude that the trial court's findings at the suppression hearing, based on the information then available, compel this court's holding that defendant, "by these tangential allegations, has failed to make a substantial showing that his constitutional rights were violated." 173 Ill. 2d at 121.

My examination of the pertinent transcripts reveals that the post-conviction judge apparently foreclosed further inquiry into the issue of Area 2 abuse before the amended post-conviction petition was filed. During a court session in which defendant's motion for substitution of judges was presented, and denied without comment, defense counsel sought leave to issue discovery subpoenas in order to fully prepare the amended petition. The transcript indicates that the State's Attorney was willing to satisfy subpoena requests involving matters within the control of the State, including a copy of the "Burge report." However, the circuit court judge, expressing his intent to narrow the issues, spontaneously and somewhat cryptically announced his views on the alleged abuse at Area 2:

"I specifically don't care what John Burge did at Area 2. I don't think John Burge had anything to do with this case whatsoever. We are not going to retry the *Wilson* case in this courtroom, and I wouldn't turn any of that stuff over if I were the People of the State of Illinois. *** I am going to tell you it is not going to come out in a hearing here. That has been gone through four or five times in other

courts. It is not going through this courtroom. John Burge probably doesn't have a clue who Andrew Maxwell is. That's out. That's out."

The above opinion was interjected by the post-conviction judge during a routine discussion of discovery matters. The State had not presented its motion to dismiss defendant's petition at that time and had not expressed an objection to the subpoenas in issue when the judge offered the above remarks. The judge denied defendant's request to obtain certain discovery in advance of the hearing on the State's motion to dismiss the post-conviction petition and instead "reserved ruling" on the subpoenas until after the hearing on the motion to dismiss. The judge further indicated to the parties that he considered most of the other issues in the post-conviction petition to be barred by waiver and *res judicata.* The court then suggested that the State concentrate its motion to dismiss on the single issue of ineffective assistance of trial counsel during the sentencing proceedings.

The judge's remarks reflect his intent to curtail inquiry into defendant's claim of police coercion at Area 2. Although a challenge to the admissibility of some of the materials might be well founded, I do not believe that the issue raised in defendant's petition and supported by the numerous exhibits has been given a fair evaluation by either the circuit court or this court. I cannot discount as irrelevant the materials presented in the post-conviction petition that tend to support the inference that repeated and egregious abuses on the part of at least certain police officers occurred at Area 2 headquarters contemporaneous to the time in which defendant was being interrogated about the Bracy homicide. Without hearing evidence, no court can conclusively determine whether, and to what extent, the individual officers who interrogated defendant may have participated in routine interrogation abuse and whose

credibility at the suppression hearing might have been impeached as a result.

For the reasons stated, I would remand this cause to the circuit court for an evidentiary hearing on the claims discussed herein.