THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY BANKS, Defendant-Appellant (David Bates, Defendant).

First District (3rd Division)   No. 1—85—2746

Opinion filed December 28, 1989.

Randolph N. Stone, Public Defender, of Chicago (Karen E. Tietz, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Kenneth T. McCurry and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

A jury found defendant, Gregory Banks, guilty of murder and armed robbery of Leon Barkan. Defendant was found not guilty of attempted murder but guilty of aggravated battery of Jeltro Givens. The court sentenced him to concurrent terms of 50 years on the murder conviction, 30 years on the armed robbery conviction, and 10 years on the aggravated battery conviction. On appeal, defendant contends that he should receive a new trial. We agree. We reverse and remand for a new trial.

Defendant is a 21-year-old African-American. He contends that the court erred in denying his motion to suppress his confession because it was procured by police brutality and racial intimidation, and that the court erred in excluding testimony regarding similar coercion of another person by the same police officers.

At the suppression hearing, defendant testified that he was arrested on October 18, 1983, at 8:30 p.m., and taken to the police station. Defendant was taken to an interrogation room and handcuffed to a ring. On the following morning at approximately 2:30 a.m., defendant was taken to another room where he was handcuffed behind his back. Detectives Peter Dignan and Charles Grunhard, and po-

lice sergeant John Byrne, interviewed defendant and confronted him with accusations which he persisted in denying. Defendant testified that Byrne put a chrome .45 caliber automatic gun with a brown handle in his mouth and told him that he should blow off his head because he knew what they were talking about. In addition, Byrne struck defendant three or four times across the left side of his chest and stomach with a flashlight while his wrists were handcuffed behind his back. Defendant fell out of the chair, and Grunhard kicked him in his side, stomach and ankle, and hit him on the back of his legs with a flashlight.

When defendant continued to deny knowledge of what the officers were talking about, Dignan said "we have something for niggers," and he put a plastic bag over defendant's head. While the bag was on defendant's head, Grunhard kept kicking him in the stomach and on the left side of his body. Defendant testified that after a minute or two the bag was removed and the three officers left the room.

Approximately 10 minutes later, the three officers returned and asked defendant what he was going to do. Defendant again denied knowledge of the occurrence, and Dignan placed the plastic bag over defendant's head a second time for about two minutes. Thereafter, defendant confessed and informed the officers that the gun that was used in the occurrence was at 56 W. 95th Street in Chicago. At 4:30 a.m., defendant accompanied the officers to that location.

Defendant testified that at 56 W. 95th Street, the officers handcuffed him to a bar on the stairwell, while they recovered a gallon of liquid narcotics from the second-floor landing, and the gun on the roof of the building. According to defendant, he did not try to escape and was neither tackled nor struck after he confessed and the gun was recovered.

During the hearing on the motion to suppress, the State introduced the testimony of eight police officers and an assistant State's Attorney who were involved in investigating the case. All of the State's witnesses denied involvement in or knowledge of defendant being beaten, except Dignan, who testified that he punched defendant several times.

Detective John Gallagher and William Egan testified that they arrested defendant on October 28, 1983, at 8:30 p.m., handcuffed him and took him to the police station. Detective Charles Grunhard testified that he, Byrne and Dignan spoke with defendant at 4:30 a.m. on October 29. Byrne testified that after that conversation, at about 5:30 a.m., Byrne and Dignan took defendant, without handcuffs, to 56 W. 95th Street, where they recovered a gun that was on the roof and a

container of liquid narcotics from the second-floor rear porch. Byrne testified that defendant then tried to escape by running down the porch stairs. Defendant was not handcuffed at the time.

According to Bryne, Dignan tackled defendant right at the bottom of the stairs and defendant fell on flat concrete with Dignan on top of him for the most part. Byrne testified that Dignan dove on defendant when he tackled him. Byrne and Dignan then handcuffed defendant. Byrne testified that at no time did he or any detective in his presence strike the defendant. Byrne also testified that he did not specifically recall being accused of participating in a beating with a flashlight and the placing of a plastic bag over the head of another person in September of 1982. Byrne did not make, sign or review any reports relating to the investigation of the present case. However, he may have signed Dignan's injured on duty report.

Dignan completed an injured on duty report reflecting an injury to his left leg from a brief scuffle when defendant attempted to escape, but Dignan failed to report defendant's escape attempt or his or defendant's injuries on any other police report. Although Dignan visited a hospital the day after the incident for the injury to his leg, he did not take any time off from work because of the injury. Dignan testified on direct examination that after defendant attempted to run down the stairs, he grabbed him and they went down the stairs. They wrestled, and defendant was subdued. Defendant was then handcuffed. Dignan also testified on direct examination that at no time did he or any other detective in his presence strike defendant.

On cross-examination, Dignan testified that defendant started running down a set of stairs that was more than 5 but less than 15 stairs. Dignan took a couple of steps down the stairs and grabbed defendant, and they went down onto the next landing. Dignan "more or less tackled him," and they rolled over each other sideways. Dignan testified that they were on the third-floor landing when defendant ran down the stairs, and they ended up on the next landing. Dignan also testified on cross-examination that after he and defendant ended up on the next landing, Dignan "punched him a couple of times." He testified: "I punched him a couple times. I don't know where I punched him. I was just swinging." When Dignan was asked if defendant punched him at that time, Dignan testified: "I got an elbow in the face." Immediately afterward, according to Dignan, defendant was handcuffed. Dignan also testified that it was very possible that he placed the handcuffs on defendant rather tightly at that time, and that defendant might have complained about the handcuffs being too tight at the scene or on the way back to the station. Dignan

did not recall anyone raising similar allegations of coercion against him or Byrne.

Detective Robert Dwyer testified that he spoke with defendant at 11:30 p.m. on October 29, 1983, and was present the following morning at 3:20 a.m. when defendant gave a confession statement to Assistant State's Attorney Dean Bastounes and a court reporter. This statement was given approximately 31 hours after defendant was arrested. According to Bastounes, defendant did not complain that he had been threatened, beaten or mistreated by the police. Bastounes did not notice any injuries or bruises on defendant, but admitted that he had not examined him.

Dr. Walter Romine testified that on November 3, 1983, he examined defendant pursuant to his duties at Cermak Hospital. Dr. Romine testified that defendant complained that the police had beaten him and placed a bag over his head. Dr. Romine's examination revealed that defendant had lacerations with scabs on both wrists, consistent with handcuff injuries. Also, defendant had multiple scrapes and scratches over his chest and abdomen. He had a bruised, swollen muscle on his left side, and some kind of a lump under his skin in the lower left rib cage. The whole area was swollen, discolored and tender. There was also a large area of swelling, tenderness and discoloration below each buttock; somewhat lateral. Defendant also had some scratches or scrapes around one of his ankles. In addition, he had a bruise on both legs in the upper posterior section of the upper thigh below the buttocks.

Dr. Romine testified that defendant's injuries "were consistent with the story" that he told him. Dr. Romine also testified: "It looked like he was struck several times with something, some blunt object." In addition, Dr. Romine testified that defendant had a bruised chest, and that he was struck with some kind of a blow in that area to get that kind of injury. Dr. Romine testified that "some object struck him there."

When Dr. Romine was asked if defendant's injuries were consistent with a fall or tumble down a flight of stairs, he answered: "I don't think so." According to Dr. Romine, defendant's injuries were from two to seven days old and consistent with the defendant's statements as to how he was injured. Therefore, Dr. Romine reported the alleged police abuse to the hospital's medical director.

On cross-examination, when Dr. Romine was asked if defendant's injuries would be consistent with falling down stairs, he answered, "No." Dr. Romine testified that the injuries were not consistent with a fall down stairs because there were no injuries to bony prominent

areas, such as the pelvis, knees, top of the head or spine. On cross-examination of Dr. Romine, the following occurred:

[PROSECUTOR:]

"Q. Well, Doctor, let me give you a hypothetical. If the defendant were tackled or the patient was tackled, would these injuries be consistent with a tackling, falling to the ground?

A. I would say more so if he were handcuffed, but normal protective reflexes could tend to cause most injuries to be under extensive circumstances and put on the surface of the chest, because—

Q. I understand that, but it's possible, is it not?

A. Yes."

With reference to the above testimony, we note that both Byrne and Dignan testified that defendant was not handcuffed when he was tackled and fell down stairs or to the ground.

In addition, at the suppression hearing the parties stipulated that a person named Lee Holmes would testify to similar complaints of coercion by Byrne and Dignan 13 months prior to defendant's arrest in the present case. After the suppression hearing, the court denied defendant's motion to suppress his confession, and the confession was subsequently admitted into evidence at trial. Also, the court granted the State's motion *in limine* barring any reference at trial to prior complaints of coercion by Byrne or Dignan.

In reviewing this case, we bear in mind that in a criminal case the police are considered part of the prosecution team. Thus, when there is a motion to suppress because of alleged police coercion or racial intimidation, the trial judge must maintain a conscious awareness that the testimony of police is not to be viewed in isolation as if they have no interest in the outcome of the case. Rather, the testimony must be examined by the trial judge with the same scrupulous eye that one would expect the trial judge to use to assay the testimony of a party to the lawsuit.

■ Also, the trial judge must keep in mind that ours is an adversary criminal justice system, and there must not be any naivete that it is otherwise. The stark realities of our adversary criminal justice system are such that what occurs within the confines of a police station during custodial interrogation when there is no attorney present is not always what the unsophisticated would expect. (See *Miranda v. Arizona* (1966), 384 U.S. 436, 448-58, 16 L. Ed. 2d 694, 708-14, 86 S. Ct. 1602, 1614-19; *Brewer v. Williams* (1977), 430 U.S. 387, 399, 51 L. Ed. 2d 424, 436-37, 97 S. Ct. 1232, 1240.) It follows that when it is evident that a defendant has been injured while in police custody, as is

true in the present case, the State must show by clear and convincing evidence that the injuries were not inflicted as a means of producing the confession. This means that something more than a mere denial by the police of coercion and racial intimidation is required to deny the motion to suppress. *People v. Wilson* (1987), 116 Ill. 2d 29, 35, 506 N.E.2d 571, 575.

Here, Doctor Romine testified that when he examined defendant on November 3, 1983, he found that defendant's injuries were consistent with defendant's testimony that he was beaten and struck with a flashlight and kicked in the stomach, side and ankle. He testified that it looked like defendant was struck several times with a blunt object. In addition, Doctor Romine testified that defendant's injuries were not consistent with falling down stairs. On cross-examination, Doctor Romine testified that while it was possible for the injuries that he observed to be consistent with being tackled and falling to the ground, it would be more likely so if defendant had been handcuffed at the time. Since Byrne and Dignan both testified that defendant was not handcuffed when he was tackled and fell down stairs, Doctor Romine's testimony, and hence the only medical testimony in the case on the issue, plainly supports defendant's version of how he was injured. As to the police officers' testimony that defendant was not handcuffed when he attempted to escape while on the rear porch of the building at 56 W. 95th Street, there is no explanation in the record why defendant was not handcuffed at that time, but yet was handcuffed when he was arrested and when he was at the police station in custody. Defendant testified that he was in handcuffs while he was on the porch and at the 56 W. 95th Street building.

■■ Despite the medical testimony supporting defendant's claim that police brutality was used to obtain his confession, the State essentially relied on mere denials of coercion by the police officers. This was plainly not sufficient to establish by clear and convincing evidence that defendant's injuries were not inflicted as a means of producing the confession. Since the State failed to show by clear and convincing evidence that the confession was not the product of coercion, defendant's confession should have been suppressed as having been involuntarily given. (*Wilson*, 116 Ill. 2d at 35.) Moreover, in our system of government, the use of a defendant's coerced confession as substantive evidence of his guilt cannot be considered harmless error. This case must therefore be remanded for a new trial. *Payne v. Arkansas* (1958), 356 U.S. 560, 568, 2 L. Ed. 2d 975, 981, 78 S. Ct. 844, 850; *Rose v. Clark* (1986), 478 U.S. 570, 577-78, 92 L. Ed. 2d 460, 470, 106 S. Ct. 3101, 3105-06.

We believe that this case is another reminder of the grave responsibility that trial judges have and must be willing to exercise when ruling on motions to suppress based on charges of police brutality and racial intimidation. If our constitutional rights and guarantees are to be in fact enjoyed equally by all our citizens, trial judges must ensure that those suspected of crimes do not relinquish their constitutional rights and guarantees solely because they become matched up against an uncaring or overzealous law enforcement officer who may be bent on obtaining a confession without regard to the suspect's constitutional rights and guarantees. In this regard, trial judges must bear in mind that while we no longer see cases involving the use of the rack and thumbscrew to obtain confessions, we are seeing cases, like the present case, involving punching, kicking and placing a plastic bag over a suspect's head to obtain confessions. See *Wilson*, 116 Ill. 2d at 35 (defendant was granted a new trial on the basis that he was punched, kicked, smothered with a plastic bag, electrically shocked, and forced against a hot radiator throughout the day until he gave his confession).

When trial judges do not courageously and forthrightly exercise their responsibility to suppress confessions obtained by such means, they pervert our criminal justice system as much as the few misguided law enforcement officers who obtain confessions in utter disregard of the rights guaranteed to every citizen—including criminal suspects—by our constitution. Moreover, trial judges must be most circumspect when it appears that a right guaranteed to every citizen by our constitution may have been violated by police brutality or racial discrimination, for those affected are invariably the poorest, the weakest and the least educated, who are not sophisticated enough or do not have the resources to see and ensure that they are not denied the protections afforded by the rights and guarantees of our constitution.

We next address the State's motion *in limine* to bar any reference at trial to prior similar complaints of coercion having been made against Byrne and Dignan. Although this issue may not arise in the new trial, we believe it is so closely related to the wrongful admission of defendant's confession into evidence that it warrants our consideration here.

At the suppression hearing, the parties stipulated that Lee Holmes would testify that on September 10, 1982, 13 months prior to defendant's arrest in the present case, Byrne and Dignan beat Holmes with a flashlight and put a bag over his head while he was being interrogated after being arrested. The parties further stipulated

that Holmes received medical treatment that same day for injuries to his arm and leg, and that Holmes filed a complaint against Byrne and Dignan with the Office of Professional Standards. However, the State made a motion *in limine* to bar any reference at trial to the prior complaints that were made against Byrne and Dignan, and the motion was granted. As a result of the trial court's ruling on the motion *in limine*, at trial defendant was precluded from making any reference to what Byrne and Dignan had allegedly done to Holmes 13 months prior to defendant's arrest in the present case. We believe the trial court's ruling was erroneous.

■ We believe evidence that the same police officers, Byrne and Dignan, beat another suspect with a flashlight and put a bag over his head while being interrogated after being arrested is relevant in the present case. Plainly, such conduct is an aberration from the conduct of other police officers. Thus, such evidence tends to show the conduct that these two police officers employ in interrogating suspects who are in custody, and such evidence is therefore probative as to the conduct they employed in the present case to obtain defendant's confession. Since the evidence of the prior conduct of the police officers tends to prove an issue at trial, it was relevant and should have been admissible.

The trial court's conclusion that the 13-month lapse between the two incidents made the prior incident too remote to be admissible at trial is without merit. We believe it is plain that a 13-month period between virtually identical incidents of brutality by police officers is not too remote to tend to prove the type of conduct used by the particular police officers when interrogating suspects after arrest. We therefore conclude that the trial court erred in granting the State's motion *in limine*.

We next address the defendant's contention that the trial court erred in refusing to give the jury his tendered instruction on involuntary manslaughter. The facts of the occurrence are disputed. Jeltro Givens was a witness for the State. He testified that on October 27, 1983 at 11 p.m., he and the victim, Leon Barkin, went to the home of Kenny Taylor. Barkan telephoned Jerry Caldwell, and Caldwell arrived at Taylor's home 10 minutes later. Caldwell spoke with Barkan and left. Thereafter, Caldwell returned with a gallon of cough syrup and codeine, and poured a glass for Taylor. Forty-five minutes later, Caldwell, Givens, and Barkan left Taylor's house, with Barkan carrying the bag with the syrup and codeine.

After they walked past two houses, according to Givens, two men wearing ski masks jumped out of the bushes approximately 10 feet

away from them. One of the men wearing a ski mask pointed a gun at Barkan. While Givens ran across the street, the man shot in Barkan's direction two or three times. Barkan dropped the bag with the syrup and codeine, and fell to the ground. Givens turned, started running and heard bullets ricocheting. Givens was hit in the right thigh and fell. While on the ground, he saw the second man grab the bag and run. When Givens was questioned by police officers at the scene, he did not say anything about anyone wearing a ski mask.

Defendant testified that while at work on October 27, 1983, at 7 p.m., he received a phone call from Barkan, who wanted to meet him after work. After work, defendant waited for Barkan outside of Taylor's house because defendant and Taylor were not on friendly terms. When Barkan, Givens and Caldwell emerged from Taylor's house, Barkan told defendant that he had two gallons of syrup and codeine. Defendant responded that he had given Caldwell enough money for five gallons and asked for the difference.

Defendant testified that he and Barkan started arguing. As the argument continued, defendant pulled out a gun. Barkan jumped at the gun, and the two of them scuffled over the gun. During the scuffle the gun went off. Defendant testified that he fired the gun three times. Defendant testified that when he pulled the trigger the gun was pointed at the ground, and that when the gun fired, Barkan fell backward. Givens then moved toward defendant, so defendant fired toward Givens to "brush him off." The bullet hit Givens in the right leg. Defendant then picked up the bag and went to his mother's house. He was subsequently arrested.

Dr. Lee Beamer, a certified forensic pathologist with the Cook County medical examiner's office, testified for the State. He testified that he performed an autopsy on Barkan and observed that the decedent had projectile wounds of the right thigh, left thigh and hip area. Dr. Beamer also testified: "On the posterior-lateral, or backward aspect of the left thigh there was a projectile wound of entrance. This wound did not exit. The projectile was found within the body." According to Dr. Beamer, the projectile wound in the left thigh was directed towards the deceased's front, towards his right and slightly upward.

With respect to the left thigh wound, Dr. Beamer also testified: "There was no evidence of stippling or powder on the skin. It would be my opinion it was fired from a distance greater than weapons that type would leave stippling, which is greater than three feet." In addition, Dr. Beamer testified: "The wound that entered the deceased's left thigh, I found to have gone through the abdominal cavity, through the pelvis, through the abdomen, a portion of the mesentery and to

have lacerated the deceased's right common iliac artery."

Dr. Beamer also testified that there was another entrance projectile wound in the posterior-lateral right thigh. The track of that wound was toward the front, toward the left and slightly upward. According to Dr. Beamer, based on the track of that wound, the wound is consistent with a person turning slightly away with his right foot slightly in back of the left foot.

Based on the disputed facts which we have stated, the court instructed the jury on murder, felony murder and armed robbery with respect to Barkan, and aggravated battery and attempted murder as to Givens. The court refused defendant's tendered instruction on involuntary manslaughter as to Barkan. Defendant argues that the court erred in refusing to give the jury an instruction on involuntary manslaughter. We agree.

A person commits the offense of involuntary manslaughter when he unintentionally causes the death of an individual by acts which are performed recklessly and are likely to cause death or great bodily harm to another. (Ill. Rev. Stat. 1987, ch. 38, par. 9—3; Illinois Pattern Jury Instructions, Criminal, No. 7.07 (2d ed. 1981).) Murder and the lesser included offense of involuntary manslaughter are distinguished only in terms of the mental state required. Murder requires the intent to kill or do great bodily harm or knowledge that the acts create a strong probability of such result, while involuntary manslaughter requires only reckless conduct which causes death. (*People v. Cowen* (1979), 68 Ill. App. 3d 437, 441, 386 N.E.2d 435, 438-39.) If there is some evidence in the record which would reduce the crime to involuntary manslaughter, the defendant is entitled to an instruction defining the lesser offense. *People v. Santiago* (1982), 108 Ill. App. 3d 787, 802, 439 N.E.2d 984, 994.

It is defendant's theory that he and the decedent started scuffling over a gun defendant pulled out during an argument. The gun went off during the scuffle. Defendant fired the gun three times. Defendant testified that he fired the gun when it was pointed at the ground, and the decedent fell backward. Givens testified that he heard two or three shots, the ricocheting bullets. Although there were no powder wounds on the decedent's skin, Doctor Beamer's testimony is such that one might conclude that the trajectory of the bullets was upward, which would support a theory that the bullets that hit the decedent ricocheted upward from the ground.

Surely, one does not point and fire a gun at the ground if he intends to kill someone. Under the circumstances, we believe that there was some evidence, if believed, that defendant unintentionally caused

the death of the decedent by acts which were performed recklessly and likely to cause death or great bodily harm. We therefore conclude that defendant was entitled to an instruction defining the offense of involuntary manslaughter. At the new trial, if the evidence on the issue is at least the same, defendant should be entitled to have the jury instructed on the offense of involuntary manslaughter.

Defendant also contends that he should receive a new trial because of the State's use of peremptory challenges to exclude African-Americans in violation of the Constitution, the State's prejudicial references to other crimes, and the admission of evidence that defendant had been implicated by an occurrence witness who did not testify. Also, defendant contends that the court erred when it failed to consider mitigating factors in sentencing, and in imposing extended terms for the murder and aggravated battery convictions. In view of our holding that the judgment must be reversed and the case remanded for a new trial on the issues we have discussed, we do not address the other errors alleged by defendant.

Accordingly, the judgment of the circuit court on the convictions of murder, armed robbery and aggravated battery is reversed, and the case is remanded for a new trial.

Reversed and remanded for a new trial.

FREEMAN, P.J., and WHITE, J., concur.