2021 IL App (1st) 191612-U

THIRD DIVISION
September 29, 2021

No. 1-19-1612

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 92 CR 26057(02) |
| | ) | |
| JOSEPH DIXON, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Gordon and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court properly denied defendant leave to file his *pro se* successive postconviction petition because he failed to set forth a colorable claim of actual innocence.

¶ 2    Defendant Joseph Dixon appeals the trial court's denial of his motion for leave to file his *pro se* seventh successive postconviction petition. On appeal, defendant argues that the trial court erred in denying leave to file his successive postconviction petition because he set forth a colorable claim of actual innocence supported by newly discovered evidence that testimony from two eyewitnesses was illegally obtained by police misconduct.

¶ 3    In December 1992, defendant, along with codefendants Christopher Henyerd and Milton

Sims, were indicted on multiple charges, including first degree murder and armed robbery for the

October 12, 1992, shooting death of Nick Martini in his grocery store, Blue Ribbon Foods. Sims,

a security guard for Blue Ribbon Foods, was acquitted following a 1994 jury trial. Defendant and

Henyerd were tried before a single jury and found guilty of first degree murder and armed

robbery. In July 1995, the trial court sentenced defendant to a term of 100 years for the first

degree murder and a term of 30 years for armed robbery, to be served concurrently.

¶ 4    We detail below the relevant evidence presented at defendant's jury trial as necessary for

our disposition in this case.

¶ 5    Prior to trial, defendant filed a motion to suppress the identification of Hershal Brown.

Brown testified before the grand jury that on October 12, 1992, he worked at a car wash near

Blue Ribbon Foods. He observed a vehicle with four occupants pull into the car wash, pause

momentarily, and then drive down Roosevelt Road in the direction of Blue Ribbon Foods.

Brown moved to the front of the car wash and saw the car stop approximately one quarter block

away on Roosevelt. Two men exited the vehicle and walked toward Blue Ribbon Foods while

the car followed. Later, Brown saw police outside of Blue Ribbon Foods. After he learned of the

armed robbery and shooting, Brown offered to tell police what he had seen. Brown subsequently

identified defendant in both a photo array and a lineup.

¶ 6    At the November 1994 hearing on defendant's motion to suppress, more than two years

after the murder and armed robbery, Brown recanted his grand jury testimony and stated he felt

pressured by the police to make an identification because he did not want to be involved in the

murder. Brown testified that a detective told Brown that the detective knew who committed the

crime and that Brown "was involved in it." When asked which detective said this, Brown named

Detective Kato, but another detective told Brown which person to identify in the lineup and Brown subsequently identified Henyerd. He said he figured the officers would not accuse him of the crime if he "went along with their story."

¶ 7    Detective Leslie Smulevitz testified for the State that she was present on October 16, 1992, when Brown identified codefendant Henyerd from a lineup as one of the men seen exiting the vehicle the day of the armed robbery. Brown then viewed a photo array and identified defendant as the other man observed exiting the vehicle.

¶ 8    Detective Ann Chambers testified that she was present on November 11, 1992, when Brown viewed a lineup and identified defendant. Detective Chambers denied that she or any other officers directed Brown to identify any particular person in the lineup. Following the hearing, the trial court denied defendant's motion to suppress Brown's identification.

¶ 9    At trial, Ronald Infelise testified that on October 12, 1992, he was employed as a butcher by Blue Ribbon Foods, located at 3034 West Roosevelt Road in Chicago. Nick Martini was the owner of the store. He arrived at work around 6 a.m. Sims worked as a stock and register clerk and arrived around the same time. A short time later, Infelise opened the door for the milk man, Carlton Craig.

¶ 10    While Craig was making the milk delivery, Infelise was helping in the cooler when a man wearing a black ski mask and holding a gun entered the cooler. The man in the black mask took $10 from Infelise and ordered him to get on his hands and knees in the cooler. A second man wearing a black ski mask with white stripes then entered the cooler with a gun pointed to Craig's head. The masked men ordered Infelise and Craig to stay in the cooler and the offenders "slammed" the cooler door. Infelise opened the cooler door and looked into the store while Craig remained in the cooler. He saw a figure going behind the liquor counter. Infelise then exited the

3

store and went around to the front. As he put his keys in the front door, he heard a single gunshot from inside. Infelise entered the store and saw Sims crawling on the floor. Sims told him that Martini had been shot. Infelise went to Martini, who had been shot in the back, and told Sims to call the police. Infelise identified a black ski mask with white stripes that looked like the mask worn by the second offender. The mask was recovered from defendant's vehicle a few weeks after the shooting.

¶ 11    Carlton Craig testified that he arrived for a milk delivery at Blue Ribbon Foods shortly after 6 a.m. Infelise opened the door for him, and Craig began to bring milk into the store. On his third trip, two men approached him "with guns in [his] face." Both men were wearing ski masks, one mask was black and the other was black with stripes. One of the men told him to turn around and asked if there was anyone in the store. He told them there was a man in the cooler. One man proceeded to the cooler while the man with the striped mask put Craig's head in a sink and told Craig that if he moved, the man would kill him. Craig heard the other man "hollering" at Infelise. Craig was then pushed into the cooler and ordered to lay down. The masked men then left the cooler and closed the door. He and Infelise then got up. Infelise told him he was going to run for the police, but Craig remained in the cooler. Craig then heard one gunshot. He waited one or two minutes and then he left the cooler. He did not see anyone and he went to the front of the store. He saw Infelise holding Martini in his lap on the floor. During his testimony, he also identified the black ski mask with white stripes as one worn by the perpetrators.

¶ 12    Brown testified that on October 12, 1992, he was working as a manager at Quick Hands Carwash, located at 3006 West Roosevelt Road in Chicago. Blue Ribbon Foods was about a quarter of a block from the carwash. At around 6 a.m., he observed a red and brown car sitting outside of the car wash. He recognized the car as belonging to defendant. He identified defendant

4

in open court. The car went through the car wash, but then backed up and stopped for a minute. The car then exited by making a right turn in the direction toward Blue Ribbon Foods. He testified that the car then turned onto Whipple Street. Brown denied seeing the car park and two men exit the car.

¶ 13    Brown then testified consistently with his testimony at the motion to suppress and continued to recant his observations and identifications. He admitted that he previously testified before the grand jury on October 30, 1992, and stated that two men exited the car and he identified one man as defendant. Brown also admitted that he identified codefendant Henyerd in a lineup. On October 30, 1992, Brown went with Detective Chambers to the 1300 block of South Washtenaw Avenue and identified a burgundy and brown car as the car he had seen near Blue Ribbon Foods on October 12, 1992. He also identified the car as belonging to defendant.

¶ 14    According to Brown, he was kept at the police station overnight before viewing a lineup and was directed to pick Henyerd out by a police detective. He stated that he was on probation at the time of the offense, and he felt pressured to do what the police wanted. According to Brown, one of the detectives suggested that Brown was involved in the armed robbery.

¶ 15    Sims testified that in October 1992, he worked as a cashier and stock man at Blue Ribbon Foods. On October 12, 1992, he arrived around 6 a.m. for his shift. Martini and Infelise were already at the store and another employee was in the basement. Sims began to straighten items in the produce section. He was then approached from the rear and a gun was placed to the back of his head. The gunman told Sims to turn around. Sims observed that the man was wearing a mask and he did not know who the man was. He was walked behind the counter and ordered to the floor. He saw a second gunman who was also wearing a mask. He had his face on the floor and did not see anyone with a gun on Martini because he could only see the second gunman's legs.

He observed that the safe door was open and saw the legs of the second gunman and Martini. Sims then heard a scuffle that moved closer to him and then a gunshot. After he heard the gunshot, Sims got up and ran. He did not see anyone there. Sims then called the police.

¶ 16    Sims identified both defendant and codefendant Henyerd in open court and stated that he has known both for about 10 years. Sims admitted giving a statement on October 15, 1992, to an assistant State's Attorney (ASA) with a court reporter present. In the statement, Sims admitted that in August 1992, he was approached by defendant and he asked Sims questions about Sims's job. Specifically, Sims stated that defendant had asked about opening and closing times, how many people were there, and the security. In the statement, Sims also stated that defendant told him that defendant wanted to rob the store. Sims was approached by defendant and Henyerd after work on October 9, 1992, and defendant again asked questions about Blue Ribbon Foods and indicated that he and Henyerd were planning to rob the store. They told Sims that "once they pull this off" they were going to give Sims some money. Sims further said that the man who put the gun to his head was defendant. Sims admitted that he was interviewed by detectives the day of the robbery, but he was not truthful about what he knew because he was "in fear." Sims admitted at trial that he gave these answers in his statement.

¶ 17    Sims recanted his statement at trial and testified that he made the statement because he was afraid of being charged in the crime and fear of physical abuse. He was picked up by police on October 14, 1992, and was in custody at the police station for a day and a half before providing his statement. After several hours alone in a room, a female officer entered and asked him questions. She did not tell Sims that police thought he might be involved in the robbery. Sims was left alone again for several hours before he was taken to another room with a male officer. The officer questioned Sims and he felt like he was being accused of wrongdoing. Sims

thought the officer was named Detective Kristan Kato. At some point while in custody, Sims testified that he was placed in handcuffs and Detective Kato "grabbed" him around his collar and pushed him against the wall. Sims could not recall when this occurred. Sims was told that police knew defendant and Henyerd committed the robbery. Sims stated he was also "shoved up against the wall by way of elbow [*sic*]" and "kneed in the groin area around [his] stomach." Sims was told to make the statement "the way [Detective Kato] instructed" him. Sims admitted that Detective Kato was not present when he gave his statement to the ASA, and he was not threatened by anyone present when he made the statement.

¶ 18    Devada Burns testified that he had known defendant and Henyerd since childhood. He admitted that he had two prior convictions and had two pending felony cases, but he was not receiving any "deals" in exchange for his testimony. One night in early October 1992, Henyerd asked Burns if Burns could get him a gun, and Burns responded no. Approximately an hour later, defendant approached Burns and also asked for a gun and Burns declined again. Burns admitted that he had been drinking that night and was drunk. Several days after that conversation, Henyerd told Burns that he planned to rob Blue Ribbon Foods.

¶ 19    Detective Smulevitz was assigned on October 12, 1992, to investigate the armed robbery and murder that occurred at Blue Ribbon Foods. While at the store, Brown contacted her and she briefly interviewed him. He told her he had seen a "GM type car," that he thought was a Nova in front of the car wash that morning.

¶ 20    She then testified consistently with her prior testimony at the suppression hearing regarding Brown's identifications of defendant and Henyerd. She was present on October 16, 1992, when Brown identified Henyerd in a lineup and he then identified defendant in a photo

array. Detective Smulevitz also met with Sims during her investigation. She denied striking Sims and she did not observe any other police personnel strike Sims.

¶ 21    Detective Chambers was assigned to investigate the armed robbery and murder at Blue Ribbon Foods on October 13, 1992. On October 14, 1992, she was at Blue Ribbon Foods to speak with employees and was approached by Sims, who stated that he wanted to talk to her in private. They went to an interview room at the police station. Sims told Detective Chambers that he may be able to identify the offenders from the neighborhood. The detective brought "mugbooks" for Sims to view, but he was unable to make an identification. As the interview continued, Sims "backed off saying" he knew who the offenders were and could identify them.

¶ 22    Later, she interviewed Sims again that evening in an interview room and no one else was present. Sims was not handcuffed. During the interview, Sims told her that he had not been "totally honest" and she then advised Sims of his *Miranda* rights. Sims agreed to continue speaking with the detective and named defendant and Henyerd as the offenders. Detective Chambers obtained a photograph of Henyerd and showed it to Sims, and he indicated that was the person he named. After Sims's identification, Detective Chambers went to arrest Henyerd at the address provided by Sims. She was accompanied by her partner Detective Gary Brownsberg, as well as Detective Kato and Detective James Pubins. Henyerd was arrested and taken to the police station. Detective Chambers did not have any further contact with Sims.

¶ 23    Following Brown's grand jury testimony, Detective Chambers went with Brown to the area where a vehicle was parked that matched Brown's description and was registered to defendant. As they approached, Brown identified the vehicle he had seen the morning of the robbery. Officers continued to monitor the vehicle, which did not move. On November 4, 1992, Detective Chambers observed a man enter the vehicle and learned his name was Nathaniel

Dixon, defendant's brother. Dixon told the detective that defendant had given him the car on October 12, 1992. Dixon consented to a search of the vehicle. The search recovered a ski mask with stripes in the armrest from the driver's side door and a prescription bottle with Henyerd's name from the trunk. She identified the mask recovered from the vehicle at trial. Detective Chambers testified consistently with her testimony from the suppression hearing regarding Brown's identification of defendant in a lineup on November 11, 1992.

¶ 24    Detective Kato was assigned with his partner Detective Pubins to investigate the armed robbery and murder at Blue Ribbon Foods on October 14, 1992. His first involvement was to assist in the arrest of Henyerd on October 15, 1992. He later spoke with Sims in an interview room with Detective Pubins. Sims was not handcuffed and Detective Kato advised Sims of his *Miranda* rights. The conversation lasted 20 to 30 minutes and Sims discussed what he had already told Detective Chambers and asked for different locations where police could locate defendant. He spoke with Sims again approximately eight hours later with Detective Pubins for approximately half an hour.

¶ 25    During this conversation, Sims told the detectives that defendant and Henyerd had approached him prior to the robbery and asked for help. Sims was placed under arrest after the interview. Detective Kato denied that he shoved, pushed, or threatened Sims during the interview. He also denied striking Sims. Detective Kato also denied that he provided any information to Sims about the robbery and murder. After those interviews, he had no further contact with Sims.

¶ 26    Detective Pubins testified that he was present with his partner Detective Kato for both conversations with Sims. He did not witness any physical abuse toward Sims by Detective Kato.

Detective Pubins was also present when Sims provided a court-reported statement to ASA Tom Needham and he reviewed the statement with Sims and ASA Needham.

¶ 27    ASA Needham was assigned on October 15, 1992, to speak with Sims at the police station. Detective Pubins was present during his conversations with Sims. ASA Needham advised Sims of his *Miranda* rights and Sims agreed to speak with him about the robbery and murder at Blue Ribbon Foods. In the initial conversation, Sims led him through the events leading up to Martini's murder, including when Sims first learned of the plan to rob the store. After that conversation, Sims agreed to memorialize his statement with a court reporter. The conversation with the court reporter lasted approximately 20 minutes. At the conclusion, ASA Needham asked Sims how he had been treated at the police station and if he had any complaints and Sims made no complaints. He reviewed the statement with Sims and each of them, including Detective Pubins, signed each page of the transcript. Sims's statement was admitted as substantive evidence.

¶ 28    Following the trial, the jury found defendant guilty of first degree murder and armed robbery. The trial court subsequently sentenced defendant to a term of 100 years for the first degree murder and a term of 30 years for armed robbery, to be served concurrently.

¶ 29    On direct appeal, defendant argued that: (1) he was denied his right to confront witnesses; (2) his lineup identification was unduly suggestive; (3) the trial court admitted improper hearsay; (4) the trial court improperly admitted a prior consistent statement; and (5) the cumulative effective of these alleged errors denied defendant a fair trial. This court affirmed defendant's conviction. *People v. Dixon*, No. 1-95-2166 (1999) (unpublished order under Supreme Court Rule 23). Defendant has filed numerous postconviction and section 2-1401 relief from judgment petitions. The trial court has dismissed or denied relief for these filings and this court affirmed

those rulings. See *People v. Dixon*, Nos. 1-01-0454 (2002), 1-01-3352 (2002), 1-03-1022 (2004), 1-04-1286 (2005), 1-07-0171 (2009) (unpublished orders under Supreme Court Rule 23); 2012 IL App (1st) 110045-U; 2015 IL App (1st) 130391-U.

¶ 30    In December 2018, defendant requested leave to file his seventh successive postconviction petition alleging a claim of actual innocence. In his petition, defendant asserted that his claim of actual innocence was supported by newly discovered evidence: (1) an anonymous tip received by Chicago police; and (2) evidence of Detective Kato's use of coercive interrogation techniques. Regarding the anonymous tip, defendant contended that the anonymous letter named two individuals for the armed robbery and murder at Blue Ribbon Foods, but defendant was only identified by a first name and a nickname. Defendant argued that the police needed more evidence, but their investigation was careless and "replete with error."

¶ 31    As for the evidence involving Detective Kato, defendant contended the newly discovered evidence demonstrated Detective Kato's "predisposition to coerce false statements/confessions through improper means, including the use of physical force." Defendant asserted that his newly discovered evidence described "numerous accounts, that spans for several years, of [D]etective Kato's experience, dedication and efforts in coercing suspects and civillians [*sic*] into making false statements. Indeed, both state key witnesses had alleged police misconduct during their trial testimonies." Specifically, defendant argued that Sims testified that Detective Kato and Detective Pubins coerced him into signing a statement implicating defendant and Henyerd and that Brown testified at the suppression hearing that he was instructed to identify Dixon and Henyerd by police under a threat of prosecution. Defendant stated that the newly discovered evidence was found in documents obtained through a Freedom of Information Act request. At the time of his trial,

"there was no evidence to support both of the key witnesses testimony of coercion, intimidation or threats by police investigators. This newly discovered evidence is of such conclusive character that it would probably change the result on retrial."

¶ 32    Defendant attached a handwritten letter addressed to the police department in 1992 that named "Chris Henyerd" and another man named "Joseph I don't know his last name but in the neighborhood he is known as Poo-Nanny." Defendant also included five handwritten pages purportedly from Sims's motion to suppress statements, dated November 17, 1994. He further attached 10 pages from an unidentified document, numbered as pages 17 to 26, with summaries of allegations against Detective Kato in other cases and 6 pages from an appendix to an unknown document, numbered as pages 66 to 71, listing "examples of similar illegal conduct by Detectives Cirone and Kato."

¶ 33    In May 2019, the trial court denied defendant leave to file his successive postconviction petition in a written order. In its order, the court found the anonymous tip failed to demonstrate actual innocence and if anything, it directly implicated defendant. The court noted that handwritten excerpts purportedly from Sims's motion to suppress statements were dated after Sims had been found not guilty in July 1994. Even if the pages were misdated, the court found the evidence was not newly discovered and the transcript was available to defendant before his trial in 1995. Regarding the claim of excessive force by Detective Kato, the trial court observed that defendant failed to allege any specific misconduct in his case, but instead offered conclusory statements and defendant failed to support his conclusory allegations with any affidavits from witnesses claiming coercion by Detective Kato or that their statements were false. The court held that defendant's allegations were unsupported and conclusory and did not warrant postconviction

relief.

¶ 34    This appeal followed.

¶ 35    On appeal, defendant argues that he set forth a colorable claim of actual innocence based on the newly discovered evidence that witness statements and grand jury testimony were illegally obtained and likely untrue. Specifically, defendant contends that his newly discovered evidence raised the probability that Brown's grand jury testimony and Sims's statement were the product of coercion and threats by Detective Kato. The State responds that defendant has not alleged a cognizable freestanding claim of actual innocence because defendant's alleged newly discovered evidence does not show that he did not commit the murder and armed robbery. Instead, defendant's newly discovered evidence could be used to undermine the State's evidence against him. Defendant offers no argument regarding his claim of actual innocence based on the anonymous tip on appeal and has therefore forfeited that claim. *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal).

¶ 36    The Illinois Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 through 122-8 (West 2016)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2016); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999).

13

¶ 37    However, the Post-Conviction Act only contemplates the filing of one postconviction petition with limited exceptions. 725 ILCS 5/122-1(f) (West 2016); see also *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002). The supreme court has recognized two bases upon which the bar against successive proceedings will be relaxed. *People v. Edwards*, 2012 IL 111711, ¶ 22. The first is under section 122-1(f), a defendant must satisfy the cause and prejudice test for failure to raise the claim earlier in order to be granted leave to file a successive postconviction petition. 725 ILCS 5/122-1(f) (West 2016). "To establish 'cause,' the defendant must show some objective factor external to the defense that impeded his ability to raise the claim in the initial postconviction proceeding." *People v. Holman*, 2017 IL 120655, ¶ 26. "To establish 'prejudice,' the defendant must show the claimed constitutional error so infected his trial that the resulting conviction violated due process." *Id.*

¶ 38    The second basis to relax the bar against a successive postconviction is "what is known as the 'fundamental miscarriage of justice' exception." *Edwards*, 2012 IL 111711, ¶ 23. "The United States Supreme Court has stated that the exception serves ' "as an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty, guaranteeing that the ends of justice will be served in full." ' " *Id.* (quoting *People v. Szabo*, 186 Ill. 2d 19, 43 (1998) (Freeman, C.J., specially concurring, joined by Heiple, J.), quoting *McCleskey v. Zant*, 499 U.S. 467, 495 (1991)). "In order to demonstrate a miscarriage of justice to excuse the application of the procedural bar, a petitioner must show actual innocence." *Id.* With respect to those seeking to relax the bar against successive postconviction petitions on the basis of actual innocence, the supreme court has held that "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Id.*

¶ 24. "Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). We review the trial court's denial of leave to file a successive postconviction petition *de novo*. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 39     To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; see also *People v. Jackson*, 2021 IL 124818, ¶ 41. "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Robinson*, 2020 IL 123849, ¶ 47. Evidence is material if it is relevant and probative of the petitioner's innocence. *Id*. Noncumulative evidence adds to the information that the fact finder heard at trial. *Id*. "Evidence is considered cumulative when it adds nothing to what was already before the jury." *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). "[T]he conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Robinson*, 2020 IL 123849, ¶ 47. To satisfy the conclusive character element, the defendant must "present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id*. ¶ 56. "At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Id*. ¶ 45. "In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations." *Id*.

¶ 40     Here, defendant contends that he has set forth a freestanding claim of actual innocence

based on evidence that the testimony from Brown and Sims was the result of police coercion. To support this claim, defendant failed to offer any affidavits from either Brown or Sims, but rather present excerpts from unknown documents listing allegations of police abuse against Detective Kato in other cases. However, this alleged evidence does not support a cognizable claim of actual innocence because even if this evidence was sufficient, it does not establish that defendant did not commit the armed robbery. "An allegation of newly discovered evidence of innocence is not intended to question the strength of the State's case. An allegation of newly discovered evidence of innocence seeks to establish the defendant's actual innocence of the crimes for which he has been tried and convicted." *People v. Washington,* 171 Ill. 2d 475, 495 (1996) (McMorrow, J., specially concurring).

¶ 41     In *People v. Hobley*, 182 Ill. 2d 404, 443-44 (1998), the defendant argued in support of his claim of actual innocence that he had newly discovered evidence that police officers "engaged in a pattern and practice of police torture." *Id.* at 444. However, the supreme court rejected the defendant's claim, finding that the evidence was being used to supplement the defendant's assertions that his confessions were coerced and involuntary and that the introduction of these confessions violated his constitutional rights. *Id.* Under *Hobley*, evidence of a pattern and practice of police misconduct may support a constitutional claim that the defendant's confession was coerced, but did not support a claim of actual innocence. *Id.*

¶ 42     In *People v. Jackson*, 2018 IL App (1st) 171773, *aff'd on other grounds* 2021 IL 124818, the defendant was convicted of first degree murder and aggravated battery with a firearm. At his jury trial, the eyewitnesses recanted their prior statements and grand jury testimony in which the witnesses identified the defendant as the shooter. *Id.* ¶¶ 8-9. Each claimed that they were threatened and coerced by police detectives into signing the statements identifying the defendant.

16

*Id.* ¶ 9.

¶ 43    Before the trial court, the defendant sought leave to file his successive postconviction petition alleging actual innocence based on his newly discovered evidence which he argued set forth a pattern and practice of misconduct by the police. *Id.* ¶ 53. He attached numerous documents to his petition, including logs of citizen complaint reports alleging police misconduct and documents relating to a complaint made by [a witness] that officers harassed her. The defendant "also referenced publicly available news articles and documents in civil suits relating to claims that certain detectives had coerced suspects and witnesses into giving false statements on other occasions." *Id.* The defendant also attached affidavits from two of the trial witnesses, who continued to recant their initial statements and alleged the statements were the result of police threats and coercions. *Id.* ¶¶ 54-55.  The defendant attached a third affidavit from another witness who did not testify at trial in which she detailed what she observed the day of the murder and her allegations of police coercion. *Id.* ¶¶ 56-59. The trial court denied the defendant's request for leave to file his successive petition. *Id.* ¶ 61.

¶ 44    On appeal, the defendant argued that he sufficiently set forth a claim of actual innocence based on his newly discovered evidence of a pattern and practice of police misconduct. *Id.* ¶ 70. The reviewing court rejected the defendant's argument for the same reason as in *Hobley*, *.i.e.*, his evidence of a pattern and practice of police misconduct was being used to show a violation of a constitutional right. *Id.* ¶¶ 70-71. As in *Hobley*, the defendant had also raised an alternative argument that his evidence was sufficient to support allegations of cause and prejudice based on a pattern and practice of police coercion. *Id.* ¶ 79. After considering the defendant's evidence under the cause and prejudice standard, the reviewing court affirmed the trial court and concluded that the defendant had failed to make "the necessary connection between the alleged

misconduct of any one officer that [the defendant] claims led to his conviction and a pattern and practice of sufficiently similar misconduct by that same officer." *Id*. ¶ 92.

¶ 45     Here, defendant has raised a claim of actual innocence based on a pattern and practice of misconduct of Detective Kato. Both *Hobley* and *Jackson* rejected such claims, but we acknowledge that in both cases the defendants also used the same evidence to allege a constitutional violation in his postconviction petition. In this case, defendant has only raised a claim of actual innocence and does not assert a constitutional violation. However, even if *Hobley* and *Jackson* left the door open for allegations of  the pattern and practice of police misconduct to support a claim of actual innocence, defendant has failed to set forth such a claim here.

¶ 46     Defendant alleges that his newly discovered evidence "raised the probability that the only directly incriminating evidence against [him] was fabricated and [he] was not guilty of these offenses." While at this stage we are to take defendant's allegations and supporting evidence as true, defendant's evidence does not support a claim of actual innocence. See *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 45.

¶ 47     In *Mitchell*, the defendant raised multiple claims in his successive postconviction petition, including a claim of actual innocence based on four pieces of newly discovered evidence: (1) a witness affidavit stating that he fabricated the story implicating the defendant after being beaten by police; (2) a witness affidavit stating that he observed the shootings and the defendant did not shoot the victims; (3) a witness affidavit recanting trial testimony that the defendant had joined a gang; and (4) a special prosecutor's report detailing "extensive criminal conduct" by police officers at Area 2. *Id*. ¶ 44. The reviewing court considered this new evidence and concluded that the trial court properly dismissed his claim of actual innocence without an evidentiary hearing. *Id*. ¶ 49. In reviewing the actual innocence claim, the *Mitchell* court found

that the affidavits from the two witnesses alleging police misconduct as well as a special prosecutor's report did not support a claim of actual innocence, but instead showed the weakness of the State's case. *Id.* ¶¶ 45, 47-48. The court further held that the third witness affidavit did not constitute newly discovered evidence because the witness had been disclosed on the State's witness list during discovery. *Id.* ¶ 49.

¶ 48     Even if we presume that defendant's evidence was newly discovered, he has not shown that his new evidence is material and of such conclusive character that it would probably lead to a different result. Evidence to support an actual innocence claim is material if it is relevant and probative of the defendant's innocence. *Robinson*, 2020 IL 123849, ¶ 47. "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. "In other words, leave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *People v. Sanders*, 2016 IL 118123, ¶ 24.

¶ 49     Defendant failed to attach affidavits from either Brown or Sims about the alleged threats and abuse by Detective Kato, nor does defendant explain the absence of these supporting affidavits. Rather, defendant attached handwritten excerpts purportedly from a suppression hearing in Sims's criminal case, as well as other handwritten pages in which the source is unclear. None of these handwritten pages describe any acts of police misconduct by Detective Kato. Defendant also attached 10 pages from an unknown document describing allegations against Detective Kato in other cases with multiple unreadable lines on each page. The last attachment consisted of six pages from an appendix in an unknown document listing "Examples of Similar Illegal Conduct by Detectives Cirone and Kato." These pages were listed by year with

19

names and the source of the information, such as, a case citation, an Office of Professional Standards (OPS) complaint, affidavits, or a news article. None of these sources were attached to defendant's petition. However, defendant failed to attach any OPS complaints, cases, or relevant documents setting forth specific claims of police misconduct by Detective Kato.

¶ 50    Moreover, the supporting evidence is not probative of defendant's innocence. As noted above, defendant's evidence at best suggests possible weaknesses in the State's proof affecting the weight and credibility given to the trial testimony of Brown, Sims, and Detective Kato. Significantly, this evidence does not establish that defendant did not commit the murder and armed robbery at Blue Ribbon Foods.

¶ 51    Additionally, defendant has not cited any authority to support his argument that evidence of a pattern of police misconduct can establish a freestanding claim of actual innocence. The cases relied on by defendant did not involve actual innocence claims. In *People v. Patterson*, 192 Ill. 2d 93, 107-08 (2000), the defendant raised multiple claims of ineffective assistance of trial and appellate counsel for failing to argue that the defendant's confession was coerced by police and to present evidence of similar allegations of police torture in his initial postconviction petition. The defendant also alleged that he was entitled to an evidentiary hearing to present new evidence to support his claim that his confession was coerced and he was entitled to a new trial. *Id*. at 139. After considering the evidence, the court found that the defendant was entitled to an evidentiary hearing and listed four factors that it found particularly significant: (1) the defendant consistently claimed that he was tortured, (2) the defendant's claims were "strikingly similar" to other claims of torture, (3) the officers that the defendant alleged were involved in his case were the same officers that had been identified in other allegations of torture, and (4) the defendant's allegations were consistent with the OPS findings that torture was "systemic and methodical at

Area 2 under the command of [Lieutenant Jon] Burge." *Id.* at 145.

¶ 52    In *People v. Banks*, 192 Ill. App. 3d 986, 987 (1989), the defendant argued on direct appeal that the trial court had erred in denying his motion to suppress his confession because his confession was obtained through police brutality and racial intimidation. The reviewing court observed that the doctor who examined the defendant after his confession found injuries consistent with the defendant's testimony and contradicted the officers' explanation for the defendant's injuries. *Id.* at 992. The *Banks* court also found that the trial court had erred in granting a motion *in limine* that barred testimony of prior complaints of coercion and brutality by the same two officers. The reviewing court rejected the trial court's finding that a 13-month lapse between the incidents to be too remote in time and held that "it is plain that a 13-month period between virtually identical incidents of brutality by police officers is not too remote to tend to prove the type of conduct used by the particular police officers when interrogating suspects after arrest." *Id.* at 994.

¶ 53    In *People v. Reyes*, 369 Ill. App. 3d 1, 2 (2006), the reviewing court considered the consolidated appeals from codefendants following the trial court's summary dismissal of their respective initial postconviction petitions in which both defendants had alleged that their confessions were the result of physical coercion by one police officer. The *Reyes* court reviewed the defendants' supporting evidence and concluded that they sufficiently set forth the gist of a constitutional claim that their confessions were coerced by a police detective. *Id.* at 24. The court found that evidence of other incidents from 1983, 1986 and 1993, while not occurring at or near the time of the defendants' allegations of abuse, constituted " 'a series of events spanning several years.' " *Id.* at 19 (quoting *Patterson*, 192 Ill. 2d at 140).

¶ 54    Unlike the present case, these cases cited by defendant involved allegations that the

defendant's own confession had been coerced as a result of police misconduct and abuse. Further, none of these cases relied on allegations of police misconduct to support a claim of actual innocence. Rather, each case raised a constitutional violation or sought a new trial based on errors by the trial court, which defendant has not alleged here. Since defendant failed to set forth a cognizable claim of actual innocence, the trial court properly denied defendant leave to file his successive postconviction petition.

¶ 55    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 56    Affirmed.